STATE OF CONNECTICUT *v.* JAMES HASKINS

STATE OF CONNECTICUT *v.* MICHAEL ALSTON

PETERS, PARSKEY, SHEA, DALY and COVELLO, Js.

Argued June 9—decision released September 21, 1982

*John R. Williams,* special public defender, for the appellant-appellee (defendant Haskins).

*David N. Rosen,* special public defender, with whom, on the brief, was *Edward J. Dolan,* for the appellant-appellee (defendant Alston).

*William F. Gallagher,* special assistant state's attorney, with whom were *Maureen T. Platt,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, for the appellee-appellant (state).

PARSKEY, J. In a four count information, the defendant, James Haskins, and his codefendants, Michael Alston and Harold Simmons, were charged in the first count with robbery while armed with a deadly weapon, in the second and third counts with assault in the first degree and in the fourth count with kidnapping in the second degree. The first counts were dismissed as against Haskins and Alston and the state has appealed. In a joint trial to the jury with their codefendant Simmons, Haskins and Alston were acquitted of the kidnapping charge and convicted of the two assault charges. In his appeal Haskins raises challenges with respect to (1) the jury array; (2) the pretrial incarceration; (3) nondisclosure of electronic surveillances; (4) curtailment of jury voir dire; (5) denial of jury voir dire with respect to certain publicity; (6) denial of severance of joint trial; (7) admission of certain evidence; (8) limitation of cross-examination; (9) prosecutor's summation; and (10) sufficiency of the evidence. Alston in his appeal challenges (1) the exclusion of an extrajudicial statement by a witness for the state; (2) joinder of his trial with those of Haskins and Simmons; and (3) the jury array. We shall address first the appeals of the several defendants, after which we shall discuss the state's appeal in both cases.

## Factual Setting

The jury reasonably could have believed the following facts: On May 3, 1974, a robbery, in which Haskins, Alston and Simmons were participants, occurred at the New Haven Savings Bank in the Westville section of New Haven. Officer William Bradley, the first officer to arrive on the scene, was shot in the chest and arm by one or more of the bank robbery participants as he exited his police car. Although wounded and helpless, Bradley was once again shot as he sought cover and sustained another wound to the chest. Bradley subsequently underwent surgery and eventually recovered.

After the shooting incident involving Bradley, the defendants fled in a taxicab holding a gun to the cab driver's head. After a gun battle with police, the defendants left the cab and scattered. Haskins and Alston entered 703 George Street, New Haven. Although called upon by police to surrender, the defendants responded with gunfire during the course of which Officer Lawrence Cramer was struck by a bullet in his left thigh. Another police officer, Officer Giannotti, was struck in the face by a piece of wall plaster after having been narrowly missed by a bullet landing only inches from his head. Haskins and Alston subsequently surrendered. Police officers recovered several weapons and a large quantity of ammunition including a .357 magnum revolver and a .38 caliber revolver. Several spent shell casings from these weapons were also found. The money from the bank was also recovered on a backyard fence at 703 George Street.

Haskins, Alston and Simmons were arrested pursuant to a state bench warrant. Shortly thereafter the three were indicted on federal bank robbery charges and were tried, convicted and sentenced in the United States District Court for the District of Connecticut to long terms of imprisonment. Following the imposition of sentence in federal court Haskins, Alston and Simmons were brought to trial in Superior Court in relation to the same incident. Upon conviction Haskins and Alston were each sentenced to terms of not less than ten nor more than twenty years imprisonment, the sentences to run consecutively with the federal sentences.

HASKINS' APPEAL

I

CHALLENGE TO THE JURY ARRAY

The defendant Haskins claims that the county jury commission violated his right to a jury drawn from a fair cross-section of the community by excluding particular groups from the jury array. "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren* v. *Missouri,* 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979); *State* v. *Frazier,* 185 Conn. 211, 216–17, 440 A.2d 916 (1981); *State* v. *Machia,* 38 Conn. Sup. 407, 412, 449 A.2d 1043 (1979).

The defendant has failed to show that ten of the twelve groups claimed by him to have been excluded meet the first prong of the prima facie test: (1) naturalized citizens opposed to the present form of government in the United States; (2) voters with arrest records; (3) people living in apartments or not listed in the city directory; (4) people with insufficient formal education; (5) the elderly; (6) clergy; (7) teachers; (8) students; (9) low-income persons; (10) people in particular neighborhoods. Binding authority addressing constitutional claims to the jury array[1] has thus far recognized as cognizable groups only blacks; *Carter* v. *Jury Commission,* 396 U.S. 320, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970); women; *Taylor* v. *Louisiana,* 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); Mexican-Americans in Jackson County, Texas; *Hernandez* v. *Texas,* 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed. 866 (1954); and Puerto Ricans in Fairfield County, Connecticut. *State* v. *Villafane,* 164 Conn. 637, 645, 325 A.2d 251 (1973).

Cases from other jurisdictions cited in the defendant's brief which have found some of the ten foregoing groups "cognizable" for purposes of challenges to the jury array have done so categorically and without reasons persuasive to us. See, e.g., *State* v. *Cage,* 337 So. 2d 1123 (La. 1976) (geographic location); *Commonwealth* v. *Bastarache,* 101 Mass. App. 499, 409 N.E.2d 796 (1980) (the elderly); *State* v. *Jenison,* 405 A.2d 3 (R.I. 1979)

---

[1] *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 66 S. Ct. 984, 90 L. Ed. 1181 (1946), decided on the basis of the United States Supreme Court's supervisory power over the federal courts, found daily wage earners in the San Francisco Bay area to be a cognizable class; but cf. *Thiel* v. *Southern Pacific Co.,* supra, 230 (Frankfurter, J., dissenting) (daily wage earners not a cognizable class).

(teachers and students). We think the better view is to find such groups cognizable only upon a showing, not made here by the defendant, that the group has "a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace." *United States* v. *Guzman,* 337 F. Sup. 140, 143–44 (S.D.N.Y. 1972) (certain age groups are not cognizable groups); see also *United States* v. *Marcano,* 508 F. Sup. 462, 469 (D.P.R. 1980) (working class people as a concept is "too ambiguous and loose" to constitute a cognizable group); compare *Hernandez* v. *Texas,* supra, 479–80 (proof of cognizability based on community attitudes).

The defendant has not made the requisite showing of cohesiveness to render these ten categories cognizable groups within New Haven County. With regard to clergy, the elderly, certain naturalized citizens, teachers, and students, the defendant has advanced a theory of cognizability based on percentages of the population and nothing more. With regard to voters with arrest records, people

excluded from the city directory and apartment dwellers, people without sufficient formal education, and people residing in certain neighborhoods, we cannot accept the defendant's theory that decisions finding unlawful discrimination against such people in other contexts, without more, render them cognizable as groups for purposes of a challenge to a jury array. With regard to low-income persons excluded because of the statutory reliance on voting lists on which the names of such persons do not appear because they have not registered, this court has already upheld the constitutionality of this procedure. *State* v. *Brown,* 169 Conn. 692, 698, 364 A.2d 186 (1976); *State* v. *Townsend,* 167 Conn. 539, 547, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975).

With respect to blacks and women, we recall our point made earlier that these groups are deemed "cognizable" for purposes of challenges to the jury array. See *Taylor* v. *Louisiana,* supra (women); *Carter* v. *Jury Commission,* supra (blacks). We proceed, therefore, to address the issue of whether the defendant has satisfied the second point of the *Duren* test, namely, whether representation of the group on the array was fair and reasonable when compared proportionately to the number of eligible people in the group.

The evidence presented by the defendant relating to blacks is insufficient to meet the second prong of the prima facie test. His statistics relate generally to nonwhites rather than to blacks as a cognizable group. His references to the "disproportionate" number of blacks with arrest records, insufficient formal education, and low income cannot, without a more definite quantification, support a finding of unfair and unreasonable representation of blacks

on the array. Concerning his claim that the alleged exclusion of persons in a particular neighborhood had a disproportionate impact on the number of blacks on the array, suffice it to say that the base geographic unit considered for the source of the jury array is that of the county and not some smaller geographical unit. *State* v. *Frazier,* supra, 217; *State* v. *Townsend,* supra, 551. The defendant has failed to demonstrate by statistical evidence that he has satisfied the second prong of the prima facie test.

The statistical evidence presented by the defendant concerning women is more precise. Fifty-three percent of the county's population aged 21 and older were women. Forty-eight percent of the names randomly chosen from the voter registration list were women. Women constituted 39 percent of the array. Since the only women eligible for service were those who were registered voters, a qualification we have repeatedly upheld; see *State* v. *Brown,* supra; *State* v. *Townsend,* supra; we take as our base figure 48 percent. We are then concerned with the issue of whether a 9 percent discrepancy between the percentage of women available for service and those actually chosen for the array is fair and reasonable. We think it is. The jury array need not mirror the sociological composition of the community; *Swain* v. *Alabama,* 380 U.S. 202, 208, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965); or be mathematically proportionate to the percentage of the group in the community. *Duren* v. *Missouri,* supra. Substantial underrepresentation is required to make out a prima facie case. See *Castaneda* v. *Partida,* 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). "In cases where sex discrimination has been found, the statistical disparity in the representation of

women on the array has been extreme. [*Duren* v. *Missouri*, supra] (54 percent women in population of area, 26.7 percent women summoned for jury service, 14.5 percent women in jury pool); *Taylor* v. *Louisiana*, supra, 524 (53 percent women in population of area, less than 10 percent women in jury pool). Such claims have been rejected where the disproportion was greater than that found here. *United States* v. *Butera*, 420 F.2d 564, 571 (1st Cir. 1970), (52 percent women in population of area; 36 percent women in jury pool); *United States* v. *DiTimmaso*, 405 F.2d 385, 388 (4th Cir. 1968) (52.1 percent women in population of area; 29 percent women in jury pool); *United States* v. *Bryant*, 291 F. Sup. 542, 550 (D. Me. 1968) (52 percent women in population of area, 36.1 percent to 37.8 percent women in jury pools)." *State* v. *Machia*, supra, 413–14.[2] Substantial underrepresentation has not been shown in this case.

## II

### PRETRIAL INCARCERATION

The defendant Haskins was initially arrested without a warrant on May 3, 1974. He was incarcerated without being brought before any judicial officer from May 3 to 6, 1974. On May 6 he was arraigned in the Circuit Court in New Haven and thereafter was held, for failure to post bond, at the Community Correctional Center at Brooklyn

---

[2] In *State* v. *Machia*, 38 Conn. Sup. 407, 413–15, 449 A.2d 1043 (1979), the differential was the same as that claimed here. Forty-eight percent of the electors were women and 39 percent of the array was female. In view of the 9 percent differential, the appellate session found the defendant's statistical evidence insufficient to satisfy the second requirement of the prima facie case.

until May 15, 1974. On May 6 a mittimus was issued by a judge of the Circuit Court commanding the defendant's presence in that court on May 15. On May 8 John Williams entered an appearance for the defendant, together with a motion to dismiss and a demand for a preliminary hearing. On May 15 a judge of the Superior Court, on application of the state's attorney, issued a bench warrant for the defendant. The defendant was arrested on the bench warrant and was subsequently arraigned in the Superior Court on a number of serious charges. The defendant claims that his detention between May 3 and 15 was illegal, that it tainted the subsequent proceedings and that therefore his conviction should be set aside and the charges against him dismissed. We do not agree.

Arrests may be made without a warrant when the person is taken or apprehended in the act or on the speedy information of others. General Statutes § 6-49 (now § 54-1f). Once a person has been so arrested, however, he may not be subjected to extended restraint of liberty without a judicial determination of probable cause. *Gerstein* v. *Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975). But the fact that the person has been illegally arrested or detained will not void a subsequent conviction. Id., 119. Even if we assume that the defendant's arrest and subsequent detention were illegal, a big assumption indeed, the most that he would have been entitled to was a discharge by the Circuit Court after a hearing in probable cause. Since the Circuit Court had no jurisdiction over any offense punishable by imprisonment for more than five years such discharge could not be pleaded in bar of a subsequent prosecution. *State* v. *Stallings*, 154 Conn. 272, 277-78, 224 A.2d 718 (1966);

*State* v. *Fox,* 83 Conn. 286, 295, 76 A. 302 (1910);
*State* v. *Smith,* 27 Conn. Sup. 429, 432, 241 A.2d 870
(1968). The defendant gains nothing from this
claim.

## III

### ELECTRONIC SURVEILLANCE—DISCLOSURE

The trial court granted the defendant's motion
for disclosure of any electronic surveillance of cer-
tain named individuals and in connection therewith
entered the following order: "The State's Attorney
is directed to contact the New Haven Police Depart-
ment, the Federal Bureau of Investigation and the
Connecticut State Police to determine if there has
been any authorized or unauthorized electronic sur-
veillance or wiretapping involving any of the
defendants or counsel involved in this case, and
to disclose the results of that investigation. In
addition, the State's Attorney is directed to contact
the police authorities in the City of New York to
determine if they have provided any authorities
involved in the prosecution or investigation of this
case with information obtained through authorized
or unauthorized electronic surveillance, and to dis-
close the results of that investigation." In compli-
ance with this order the assistant state's attorney
submitted replies from the agencies mentioned
"reflecting that they have not engaged in author-
ized or unauthorized electronic surveillance involv-
ing any of the defendants or their counsel."[3]

---

[3] The commissioner of state police replied that "after checking our
files we find that this department never has initiated or applied for
wiretaps involving the persons and telephone numbers as principles."

The special agent in charge of the New Haven office of the Federal
Bureau of Investigation replied that "[o]ur records indicate that
the following individuals have not been the subject of an electronic

The defendant's objection to the disclosure as being wholly inadequate was overruled by the trial court. The ruling was correct. Any evidence which grows out of a person's illegally overheard conversations or out of illegally overheard conversations occurring on such person's premises which is proposed to be used against such person is subject to suppression upon his motion. *Alderman* v. *United States,* 394 U.S. 165, 180, 89 S. Ct. 961, 22 L. Ed. 2d 176, reh. denied, 394 U.S. 939, 89 S. Ct. 1177, 22 L. Ed. 2d 475 (1969). Any person aggrieved by such illegally overheard conversations has standing to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom. *Gelbard* v. *United States,* 408 U.S. 41, 59, 92 S. Ct. 2357, 33 L. Ed. 2d 179 (1972). A person is "aggrieved" for this purpose "who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. § 2510 (11); *Gelbard* v. *United States,* supra. To ascertain whether a person has been "aggrieved" within the meaning of the federal stat-

surveillance from May 6, 1974 to the present date [May 9, 1975]." He then listed, inter alia, the name and telephone number of Haskins and his attorney.

The commanding officer, Major Case Squad, city of New York replied: "that the records of this command fail to disclose any authorized or unauthorized electronic surveillance of any of the persons at any of the telephone numbers listed in your communication."

The New Haven chief of police replied: "[P]lease be advised that I am aware of no authorized or unauthorized electronic surveillance conducted by the New Haven Police Department of the telephone numbers referred to in your correspondence. Further, be advised that as a matter of law and as a matter of policy, the New Haven Police Department would not, under any circumstances, engage in unauthorized electronic surveillance. As you are aware, and as my Department is aware, authorized electronic surveillance can be obtained only through the courts in a manner prescribed by state and federal statutes. I can assure you . . . that no such authorization was sought in this matter."

ute a duty is imposed upon appropriate governmental agencies to disclose any surveillance records which are relevant to the decision of the ultimate issue, namely, whether such illegal surveillance has occurred. *Alderman* v. *United States,* supra. Semantics aside, the response of the prosecutor, together with the supporting documents, was an adequate compliance with the order of the court. There is nothing in the record before us to suggest otherwise.

## IV

### RESTRICTIONS ON VOIR DIRE

Venireman James C. Holgate was examined on the voir dire by counsel for Haskins and Alston and by Simmons pro se. Holgate's examination began at 10:30 a.m. and continued until 1 p.m., except for a recess lasting no more than thirty minutes. The examination, more than half of which was conducted by John Williams, counsel for Haskins, consumed some ninety pages of transcript. The examination of Holgate was extensive and wide ranging. Toward the end of the examination Williams asked numerous questions about Holgate's reaction to a change of policy respecting court sessions, at the conclusion of which the court cautioned Williams that unless he limited his questions to relevant areas of inquiry the court would terminate the questioning of Holgate. Williams then continued the examination along several lines of inquiry. Finally Williams commenced an inquiry into the details of Holgate's service as an intelligence officer in the Marine Corps during World War II. The court sustained the state's objection to this inquiry, remarking that it would limit Williams to about two questions if they were relevant or material. In Holgate's absence, Williams

explained that the purpose of the inquiry was to ascertain whether Holgate was ever involved in the investigation of suspected subversive activity. Holgate was then asked whether his duties as an intelligence officer involved any kind of investigative work and whether his civilian work was in the area of internal security. He was also asked whether any relatives or close friends were lawyers. Holgate answered, "no" to all of these questions, whereupon the trial court terminated the examination.

"The right to a voir dire examination of each prospective juror in any civil or criminal case is provided by § 51-240 [footnote omitted] of the General Statutes. Since the present case was tried, the right has been established as a constitutional one by the inclusion in article IV of the amendments to the state constitution the provision that '[t]he right to question each juror individually by counsel shall be inviolate." *State* v. *Anthony*, 172 Conn. 172, 174, 374 A.2d 156 (1976).

Examination of jurors on the voir dire has a two-fold purpose. First, it permits the court to determine whether the venireman is qualified to serve. Second, it aids a party in exercising his right to peremptory challenges. Id., 174-75; *Duffy* v. *Carroll,* 137 Conn. 51, 57, 75 A.2d 33 (1950). The focus of the inquiry must be restricted to testing the capacity and competency of the juror; *State* v. *Cross,* 72 Conn. 722, 730, 46 A. 148 (1900); the examination may not be used as a mechanism for planting prejudicial matter in his mind. *State* v. *Anthony,* supra, 176. A party, including a defendant in a criminal prosecution, has a right to a fair and impartial jury; he has no right to a jury programmed to decide the case his way.

Because a party has a right to examine individual jurors on the voir dire he must be allowed a reasonable amount of time to exercise that right. Arbitrary time limitations set in advance without regard to the variable latitude which may be reasonably necessary to accomplish fairly the purposes of the voir dire and with no apparent regard for the time which might reasonably be required in the particular circumstances for the proper questioning of veniremen in a criminal case unreasonably restrict that right and therefore constitute reversible error. *State* v. *Roberson,* 173 Conn. 102, 104, 376 A.2d 1087 (1977); *State* v. *Anthony,* supra, 176–77.

Although the voir dire may not be subjected to arbitrary time limitations this does not mean that the trial court may not, in its discretion, cut off questioning. So long as the trial court allows a defendant a reasonable time in which to test a juror's competency and capacity it may terminate the examination. Because of the broad discretion vested in the trial court in supervising the actual questioning, we will not reverse the exercise of that discretion with respect to the termination of questioning except in cases of a clear abuse of that discretion. We find no such abuse in this case.

## V

### PRETRIAL PUBLICITY—DUE PROCESS

After the jury had been selected but before they were sworn Haskins requested that the jurors be examined on the voir dire with respect to claimed prejudicial articles which appeared in two newspapers. One story, which related an alleged brawl at the Bridgeport jail involving Haskins and Alston, quoted a prison guard as saying that Haskins and

Alston had committed a "vicious, unprovoked assault on a guard there." The other story reported on the elaborate security measures being taken at the courthouse because of the "violent history of the [Black Liberation Army]." The court, referring to its earlier explicit precautionary instructions to the jurors, denied the motion. After being chosen, each juror was clearly and specifically instructed by the court not to discuss the case with anyone and not to read anything about it in the newspapers. Haskins claims that the court's refusal to conduct an inquiry with the jurors respecting the newspaper stories denied him due process of law.

A claim of constitutional violation is frequently easier to make than to substantiate. What we said in *State* v. *Siberon,* 166 Conn. 455, 458–59, 352 A.2d 285 (1974), in a different context applies with equal force here: "In his brief, the defendant claims that this ruling [denial of motion for mistrial] constituted a denial of his 'right to an impartial trial.' Significantly, no claim is made by the defendant that any juror did, in disregard of the court's instructions, read any newspaper article concerning the case, or that the defendant was in fact in any way prejudiced. His claim is based entirely upon the assertion that jurors absent from the deliberation room 'are bound to come in contact with such written and/or spoken material' and '[t]his could result in some form of influence upon one or more individual jurors' judgment, and if this happens, the possibility of an "impartial jury" disappears in that particular case.' As Mr. Justice Holmes observed over sixty years ago in *Holt* v. *United States,* 218 U.S. 245, 251, 31 S. Ct. 2, 54 L. Ed. 1021 [1910]: 'If the mere opportunity for prejudice or corruption is to raise a presumption that

they exist, it will be hard to maintain jury trial under the conditions of the present day.'" Haskins does not claim nor is there anything about the stories to suggest that had they come to the attention of one or more of the jurors the court could not have diluted their impact with a curative instruction without offending due process. The trial court's refusal to make inquiry of the jurors respecting the stories in question raises no issue of constitutional dimension.

To raise the duty of inquiry by the trial judge to a constitutional level it is not enough for the defendant to show that the information contained in the newspaper article is inadmissible or even that it is arguably prejudicial. A constitutional duty to conduct an inquiry will arise if the character of the information contained in the newspaper article is such that it would so taint the proceeding that no curative instruction could effectively avert the prejudicial effect. See *State* v. *Hawthorne,* 176 Conn. 367, 372–73, 407 A.2d 1001 (1978); *State* v. *Santello,* 120 Conn. 486, 490, 181 A. 335 (1935). Prejudicial material that is inflammatory or that is closely related to the case on trial could qualify. The articles here, though arguably prejudicial, did not meet the requisite standard and therefore did not trigger a constitutional duty to conduct the requested inquiry.

## VI

### JOINDER

The defendant claims constitutional error in the court's denial of his motion for severance of his trial from that of his codefendants. "Joint trials of persons jointly indicted or informed against are the rule, and separate trials the exception resting

in the discretion of the court. *State* v. *Castelli,* 92
Conn. 58, 65, 101 A. 476 [1917]. . . . There is no
affirmative duty on the part of the court to move
for separate trials. A separate trial will be ordered
where the defenses of the accused are antagonistic,
or evidence will be introduced against one which
will not be admissible against others, and it clearly
appears that a joint trial will probably be preju-
dicial to the rights of one or more of the accused.
The test for the trial court is whether substantial
injustice is likely to result unless a separate trial be
accorded." *State* v. *Varricchio,* 176 Conn. 445,
447–48, 408 A.2d 239 (1979). "[T]he phrase 'preju-
dicial to the rights of the parties' means something
more than that a joint trial will probably be less
advantageous to the accused than separate trials."
*State* v. *McCarthy,* 130 Conn. 101, 103, 31 A.2d 921
(1943). In the determination of whether substantial
injustice is likely to result from a joint trial or
whether such injustice has in fact resulted, an
important factor to consider is whether the defenses
of the codefendant are incompatible and com-
pletely antagonistic to each other. *State* v. *Gordon,*
170 Conn. 189, 190, 365 A.2d 1056 (1976); *State* v.
*Holup,* 167 Conn. 240, 246, 355 A.2d 119 (1974).
Although the defendants here may have adopted
different trial strategies there has been no showing
that the defenses were incompatible or even antag-
onistic. It is undisputed that the three codefendants
participated in a robbery at the New Haven Savings
Bank. It is undisputed that during the departure
of the robbers from the bank Officer Bradley was
shot a number of times, receiving both shotgun and
bullet wounds. It is undisputed that Haskins and
Alston went from the bank to 703 George Street
where they were cornered by the police and where
before they surrendered a gun battle ensued during

which Officer Cramer was shot. The factual focus of the trial was on who pulled the trigger and which, if any, of the nontrigger men participated as accessories in the shooting. The differing strategies of the defendants were aimed to show that the witnesses either could not identify the trigger men or what weapon if any each of the robbers used or what was said at the time by any of the robbers. Far from being incompatible and antagonistic the strategies blended into one overall strategy of demonstrating that the witnesses could not pinpoint which of the robbers did what and that therefore none of them could be found guilty beyond a reasonable doubt.

The defendant's reliance on *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968),[4] is misplaced. *Bruton* involved the admission into evidence of a codefendant's confession which strongly implicated the petitioner in the criminal activity. No such situation was present here. "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. . . . It is not unreasonable to conclude that in many cases the jury can and will follow the trial judge's instructions to disregard such information." *Bruton* v. *United States,* supra, 135. It is only where the risk is great that the jury cannot or will not follow such instructions and the consequences of failure are so vital to the defendant that the practical and human limitations of the jury system cannot be ignored. Id. None of the statements

---

[4] Made applicable to the state criminal procedure by *Roberts* v. *Russell,* 392 U.S. 293, 294, 88 S. Ct. 1921, 20 L. Ed. 2d 1100 (1968).

referred to by Haskins falls into the *Bruton* category. Some of the statements would have been admissible as verbal acts not involving the truth of the contents of the statements were Haskins tried separately. Eliciting by one codefendant of relevant evidence which directly or indirectly implicates another codefendant does not raise a *Bruton* problem. See *State* v. *Varricchio,* 176 Conn. 445, 450, 408 A.2d 239 (1979). *Bruton* is limited to cases where evidence of a highly prejudicial nature is admissible against one defendant and inadmissible against another and the risk that the jury will use the evidence against the wrong person is so great that separate trials are required.

## VII

### ALLEGED INFLAMMATORY EVIDENCE

The trial court, over objections by Haskins, admitted into evidence six color photographs of Officer Bradley's injuries, Bradley's bloodstained uniform and detailed medical testimony concerning Bradley's injuries. Haskins argues that all of this evidence should have been excluded because he offered to stipulate  that Bradley's injuries were sufficiently serious to fall within the definition of assault in the first degree, which offer the state rejected, and because the prejudicial effect of this evidence clearly outweighed its probative value. We do not agree.

"The great weight of authority is that photographs, even though gruesome, are admissible in evidence when otherwise properly admitted if they have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. Note, 73 A.L.R.2d 769, 787. A photograph, the tendency of which may be to prej-

udice the jury, may be admitted in evidence if, in the sound discretion of the court, its value as evidence outweighs its possible prejudicial effect. *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223 [1952]"; *State* v. *LaBreck,* 159 Conn. 346, 351, 269 A.2d 74 (1970); *State* v. *Smith,* 174 Conn. 118, 122, 384 A.2d 347 (1977).

Haskins' argument that the introduction of this evidence was unnecessary because of his proffered stipulation fails for two reasons. His finely tuned offer was limited to the seriousness of the injury. It did not cover the character, location and course of the shotgun pellets or bullets, which are independently probative. See *State* v. *Conte,* 157 Conn. 209, 215, 251 A.2d 81 (1968), cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428 (1969). Equally important, the test for determining the admissibility of the challenged evidence is relevancy and not necessity. *State* v. *Piskorski,* 177 Conn. 677, 701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). Since the trial court exercises a broad discretion in cases where relevant evidence is challenged as inflammatory its determination will not be disturbed on appeal unless a clear abuse of discretion is shown. Id., 701–702. Such abuse has not been demonstrated here.

## VIII

### CROSS-EXAMINATION TO SHOW BIAS

Ralph Cimmino, Carmel Cascio and Diane Tokarz testified on behalf of the state. Upon cross-examination they were asked whether they had refused to speak with a private detective who worked for Haskins' counsel. The trial court sustained the state's objection. Haskins claimed that he had a right to ask the question to show bias against him.

"Cross-examination to elicit facts which tend to show motive, interest, bias or prejudice is a matter of right, and although the extent of such cross-examination may often rest in the sound discretion of the court, a denial of the right, or its undue restriction, will constitute reversible error." *State v. Luzzi,* 147 Conn. 40, 46, 156 A.2d 505 (1959). In some instances the denial or undue restriction of this right could constitute constitutional error. *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).

Bias may be established in a variety of ways, one such way being the showing of partiality of mind. Partiality of mind whether arising out of favoritism for one side or hostility toward the other is a proper subject of inquiry on cross-examination. McCormick, Evidence (2d Ed.) § 40. Such partiality may be shown not only by direct evidence but also indirectly by conduct or language. *Daggett* v. *Tallman,* 8 Conn. 168, 177 (1830). But when partiality is claimed circumstantially the inference must be one that can be fairly drawn from the circumstances. "The inference in . . . [this] sort of evidence is from conduct or language to the feelings inspiring it; the only question is whether from the conduct or language a palpable and more or less fixed hostility (to one party) or sympathy (for the other) is inferable." 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 950.

The mere refusal of a witness to speak to an investigator for one side of a controversy, by itself, is equivocal, but when coupled with a willingness to cooperate with the other side it is quite another matter. Whether the disparate approach to the two

sides of the controversy is due to sympathy or a leaning of the mind of the witness in favor of one side or antipathy for the other or neither is for the jury to decide; but it is at least a circumstance which, if unexplained, tends to support an inference of bias. *Birmingham Ry., Light & Power Co.* v. *Norton,* 7 Ala. App. 571, 61 So. 459 (1913).

The court's ruling was correct in all three cases but even if it is regarded as erroneous with respect to any one of them the error is harmless. In the case of Ralph Cimmino, cross-examination elicited that he went to the police station at the direction of an officer of the bank where he was employed. And in the case of Carmel Cascio, on cross-examination Cascio testified that when he received a call from an investigator for one of the defendants requesting that Cascio give him a recorded statement Cascio immediately called the New Haven police department because he didn't know whether it was proper for him to talk to the defense. Upon inquiry Cascio was told that he was not required to answer any questions from representatives of the defense but that if he wished to do so there was nothing holding him back from doing that very thing. In both of these cases because the defendant was permitted to elicit the substance of the circumstances involved in his cooperation with the police, the trial court, although it might have been well advised to allow the excluded question, was acting well within its discretion. *State* v. *McDaniel,* 176 Conn. 131, 136, 405 A.2d 68 (1978). In the case of Diane Tokarz, no inquiry having been made concerning the circumstances of her speaking to any representative of the prosecution, the specific question was properly excluded.

# IX

## PROSECUTOR'S SUMMATION

Haskins claims that the statements of the assistant state's attorney during summation were highly inflammatory and grossly improper. Specifically he claims that the prosecutor repeatedly (1) asserted his personal belief in the defendant's guilt; (2) asserted as fact statements and actions without support in the evidence; and (3) attempted to inflame the jury with references to "supposed" suffering of Officers Bradley and Cramer and the political views of the defendant.

We examine the defendant's claims in the context of a number of observations concerning the role of the prosecutor in the trial of a criminal case. In *State* v. *Ferrone,* 96 Conn. 160, 113 A. 452 (1921), we said (pp. 168–69) the following: "The case before us is a criminal case, and the counsel whose statements are in question is the State's Attorney. He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through

the aid of passion, prejudice, or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." Or to put it another way "while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). "A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows." *Viereck* v. *United States,* 318 U.S. 236, 253, 63 S. Ct. 561, 87 L. Ed. 734 (1942) (Black, J., dissenting). In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions; *State* v. *Ferrone,* supra, 163; and those which are flagrant and therefore deny the accused a fair trial. *State* v. *Chapman,* 103 Conn. 453, 477, 130 A. 899 (1925). In determining whether the defendant was denied a fair trial we must view the prosecutor's comments in the context of the entire trial. *State* v. *Kinsey,* 173 Conn. 344, 348–49, 377 A.2d 1095 (1977).

458

The prosecutor's comments[5] must be examined in the context of the defendant's testimony. Upon direct examination by counsel for Alston the defendant disclosed that he had graduated from high school in 1968 after which he enlisted in the military service where he spent the next two years and nine months serving as a gas turbine technician in several places in the South Pacific including

[5] During the state's opening argument on summation to the jury, the following transpired:

"But that's going to be your first concern on that charge, that either one or both officers have that serious physical injury, and I'm obviously merely summarizing the pain and the anguish that those two officers suffered, I didn't suffer it so I can't really describe it perhaps in the detail they could, but you'll have to recall Officer Bradley's testimony and his demeanor on the stand in that connection and you will have to recall the fact that, for example, up to this day, when he testified,—when I say 'up to this day' he testified a couple of weeks ago—he currently engages in three hours of therapy attempting to restore the full use of his right hand.

"You'll have to recall on your own the various operations that he had, the various pains and ailments that he had, whether or not, for example, today, if it's a cool, rainy, misty cold day, he's bothered at all by the pellets that are still in his body; you have to make that determination, whether or not this 'oppressive pig' deserved what he got. I suppose if you take the view that some people in this courtroom do, that this is a 'oppressive pig' that should be slaughtered, then you will find there is no crime because when you have that type of a logical thought, when you are killing an oppressor, killing an enemy, killing someone who's . . .

"Now, getting back to this diagram also found on that second floor hallway was a .38 revolver with six live rounds, a shotgun at the stairway near the kitchen area, one live, one spent round, a spent .38 casing, twenty-nine live .38 rounds, two live shotgun shells, another bandoleer—I suppose some people might conclude, 'Well, it's a big frame, actually Lawrence Silver was a gun collector, he'd just been sloppy as to where he kept them; and the people who committed the bank robbery, and shot Officer Baker and Cramer, really didn't leave all that material there.'

"Again, that's your conclusion to reach, based upon all the evidence. But I would submit to you—

"He had to retire from the Police Department, he indicated he couldn't even take the strain of going to school because of the pain that's involved, he can't go to school, yet despite the fact that he

Vietnam, and that upon discharge he worked for about eight months after which he attended college where he majored in accounting and minored in business for three semesters until just prior to his arrest.

was in great pain that obviously he was, as badly injured as he was, he called in on the radio, hopefully, to protect other policement [sic].

"You make that determination. You've heard the facts.

"People can get up here and say, 'I've been punished already, feel sorry for me.' I've heard the term, 'twenty-five years' fifty times, I guess, for whatever effect it does have. When you think about that, think about the American judicial system. It takes two months to select eight people to hear a case, that's an average of one person a week; it takes six weeks for you to hear all the evidence, and probably there was times when you felt like a track team, running in and out of the room, when you wouldn't hear certain things; but you heard the facts, after you've heard the facts in a civilized atmosphere, obviously, then contrast that with what I would term the 'trials of Willie Bradley, James Baker, Lawrence Cramer and Carl Giannotti.'

"Willie Bradley's trial took place outside the front door of the New Haven Savings Bank; it lasted from all the evidence we have, probably less than thirty seconds. It was a jury of four; punishment was instantaneous. The facts were that he had a blue uniform on, was responding to prevent a crime from occurring. And he was found to be guilty, and his punishment was shotgun and handgun wounds.

"And that wasn't insufficient: As he was running, and even when he was on the ground, additional punishment was attempted to be meted out. So, that was the 'trial of Willie Bradley,' as contrasted with the trial that you have had here for as long as you've been here, and you have paid attention, and that's what juries are supposed to do; the people raise their hand and they swear to tell the truth, you're supposed to give them your undivided attention and listen to what they have to say, and then make up your minds about their credibility, which is in the law a fancy word for believability: 'Can I believe this person, has this person really meant what he said when he raised his hand and said, "I swear to tell the truth, so help me God, and here's the truth as I have told it." ' So, contrast that with the trial that Willie Bradley got, and contrast it with the trial that was attempted to be meted out to James Baker.

"His trial lasted a little longer 1.9 miles from the New Haven Savings Bank to 703 George Street, and at least four to five to six times the sentence was attempted to be meted out; and that was:

Upon being cross-examined by his codefendant Simmons, who was trying his own case, as well as during the cross-examination of the assistant state's attorney, the defendant's testimony appears to be discursive, disjointed and contentious. But when this testimony is carefully and closely analyzed and interpreted it becomes apparent that the defendant was making a number of revealing statements,

'You've got a blue uniform on, see if we can get you with a shotgun. Unfortunately, can't arrive at a verdict in your case: either you operated the car too well or you ducked or you never got close enough, the verdict was guilty but the sentence wasn't pronounced.'

"Lawrence Cramer has his trial, too, at 703 George Street, the first floor hallway; his trial was kind of quick: Walking up to the living room, bang, he sees a flash, feels the impact in his right thigh. That was his trial. The crime? Being a police officer in the New Haven Police Department. Crime: Attempting to prevent persons from getting away, who have already shot one police officer, shot at another police officer, and who have robbed a bank. Sentence: Guilty. Punishment: Gunshot in the wound, 5 to 10 per cent disability, live with that the rest of your life.

"Carl Giannotti: The same crimes, the same type of sentence attempted to be meted out. Only he was lucky, they missed him by 3 inches.

"So, when you are thinking about these people who are crying that they are oppressed, who are crying that 'I've got "X" amount of years, all I did was take money from a bank, all I did was shoot this one, shoot that one,' think of it in terms of what the contrast was that those police officers got, that Lawrence Silver got, and ask yourselves, how many countries in this world would these people have had a trial, versus, perhaps some guy in some country in uniform saying, 'I set the laws around here, I have a uniform, get the firing squad, I pronounce you guilty.'

"Ask yourselves, in how many countries in this world these people that apparently despise—and I say 'apparently' because you'll have to reach that conclusion based on their testimony—would they have had the type of trial that they've had in this court? The Judge has been termed certain things, the police officers have been termed certain things, I'm sure that they take it as part of their job as to why; but contrast the demeanor of the persons who took the stand in this case and who were subjected to cross-examination and who answered the questions—they probably didn't like it—but they answered the questions, and there was sometimes they said, 'I'm mistaken,' and there are times they said, 'I don't remember,' and

namely, that he was being prosecuted in the state criminal justice system not for the particular offenses with which he was charged, since he had already received a twenty-five year sentence in the federal court for those offenses as against the maximum sentence of five years normally imposed for a federal bank robbery, but rather because of his work against the continuation of needless suffer-

---

sometimes they said, 'Yes, I said this in the Federal Court and I'm saying this now,' you contrast that testimony on their part, when you contrast the testimony of James Haskins and Michael Alston—'I swear to tell the truth, and the whole truth, so help me God'—and then you just recall the replies to my questions.

"And you make the determination as to where the truth in this case lies. The truth lies in the body of Willie Bradley, who can no longer be a policeman, or in the defendants' testimony?"

. . .

During the state's final summation the following transpired:

"This trial would not have been necessary if persons had not come into New Haven and robbed the bank and shot two police officers, and kidnapped the third person. We didn't go out and solicit this trial. We didn't go out and tell someone from New York and some-one from New Jersey to come rob a bank and shoot two police officers. Of course, it costs money. If Mr. Dolan mentioned anything to you about the cost in human terms, suffering of Mr. Bradley and Mr. Cramer, not a bit. Did he mention anything to you about what it cost hospitalization of Mr. Bradley and Mr. Cramer? No word on that. Has he mentioned anything on disability that Mr. Bradley is now serving? Of course, that costs money too. Justice does cost money. The three people in this room just can look in the mirror and say, 'We are the cause of it.'

"Then [Attorney Dolan] said, 'Michael Alston is a person who is full of love and really come to know and appreciate him during this trial.' And he also indicated to you he's a sensitive person. Maybe. Ask yourself what sensitive person can walk into a bank with a weapon and commit a holdup in that bank, with all the persons in there. It was a bank robbery. You will have in the jury room with you those photographs of the people in the bank in the course of the robbery, and just take a look at those people's positions they were in, forced to crouch down, terrified, not knowing what's going to occur. And it's a bank robbery and we see them on television everyday. Now we see guns, police story, all these police guns, and not take them too seriously. I think you come down to the real part of the case, when you look at a couple pieces of evidence, and

ing that the underprivileged people, especially blacks, are forced to endure. Furthermore, he testified that he was being prosecuted because he opposed a societal system which was designed to permit the wealthy few to profit off of the sweat of the many downtrodden, and because he believed that police officers in general and Officers Bradley (who was also black) and Cramer in particular

you have to tie these pieces of evidence in with the testimony of the two defendants. They told you in their own words what they said, and what the Black Liberation Army stood for. It stood for full employment, decent housing, free education, free medical care, social assistance. Now, you ask yourself, how you can equate or relate any one to all of those with what they did by what the evidence shows that they did, Willie Bradley, Lawrence Cramer and Lawrence Silva? How can you equate any of that? Absolutely impossible.

"Mr. Williams says, 'Separate the facts from the baloney.' I would ask you to separate the facts from the baloney. You know the old saying, 'Action speaks louder than words.' They would have been happy to philosophize for weeks what they consider their membership in the Black Liberation Army to be. When you really look at their actions on May 3, 1974, you get the answer . . . .

"So, shooting a police officer is not a crime. It's ridding the people of an oppressor. You, perhaps, can accept that type of ideology. If you do, then I guess you can say 'not guilty.' And I guess you can say in effect, 'Willie Bradley, I'm sorry about the sacrifice. It was in vain.' You could say the same thing for Lawrence Cramer. 'You should have ducked. You shouldn't have responded so quickly. You should not have gone into 703 George Street. Let them smoke them out, or shoot them out. Why did you try to take them alive?' Or Willie Bradley, 'Why did you try to prevent that bank robbery? You don't have your right arm to use, that's the breaks. That happened to a lot of people in Viet Nam, so be it.' Just another walking wound, throw you away. You can reach that conclusion, I guess, I would like to think you're not going to. You will carefully consider the evidence. You will consider not only what the defendants did not say when they testified, and about what they did say. And other documents that speak far more loudly than what Mr. Williams wants to tell you about certain things, and what he thinks about his clients, or Mr. Dolan. Shotguns tell you a lot more. And a .357 magnum tells you a lot more, and a .38 tells you a lot more, and a .32 and a .44, they speak very very loudly. All you have to do is ask Willie Bradley and Lawrence Cramer that—they speak very loud and clear.

were part of this apparatus of oppression and therefore represented an immediate threat to any effort to bring about the essential radical change in society. He joined the Black Liberation Army because attempts to correct the situation through such organizations as the NAACP and by such nonviolent methods as those used by Martin Luther

Finally, Mr. Simmons would have you believe that there was a witness, you remember, I think his name was Okenewski. He was in the building next to the doctor's building and he saw somebody go by and shoot four shots. Mr. Okenewski was not able to identify the person, but apparently Mr. Simmons would like to have you believe it was him. Maybe it was, and maybe it wasn't. That's the only time he fired his weapon. I think one thing you have to keep in mind, and that is the distance between the bank and 703 George Street. Was that entire area checked for spent casings and shotguns? In all probably, not. If the State could not prove to you beyond a reasonable doubt that Harold Simmons, for example, personally had one of the shotguns at the bank, or Harold Simmons personally had a handgun that put the hole in Willie Bradley's chest and came out the back. He's not entitled to acquittal. The law is clear on that point. He participated in the bank robbery. He participated in the flight from the bank robbery. He participated in the events that occurred outside the bank, and when you aid in the commission of a crime, you are equally guilty with the person who committed the crime. The guilt of one is the guilt of all. That is the law. You all indicated concern in this case, that would include the State, that you would follow His Honor's instructions on the law. And so, you can deliver a verdict of guilty on all of those defendants on all the charges, either by finding that they were persons who personally had the shotguns in the case of Mr. Bradley, and the handgun in the case of Mr. Cramer. If you can't legitimately reach that conclusion, then you have to go one step beyond. Did these men, by their actions on that date, aid in the commission of the crimes resulting in the injuries to Mr. Bradley and Mr. Cramer? If you can legitimately answer that, 'Yes.' Then they're guilty under the law. Defendants don't like that law. They told you that in so many words. But that happens to be the law. They don't also like the law that says you can't rob a bank. They don't like the law that says you can't shoot a policeman. But it does happen to be the law. It does happen to be the law by civilized people."

Counsel for the defendant made appropriate objections and motions for a mistrial on the grounds claimed at p. 456, supra.

King not only were futile but more importantly once the economic exploiters observed the direction in which the peaceful liberation of blacks was moving, especially in the case of the Vietnam war, they deprived the movement of its source of funds. He refers to policemen as pigs because they do the dirty work of the economic exploiters. Although Bradley and his ilk were the immediate threat, the ones who deserve the real emotion of black people were those who engineered the Willie Bradleys of a capitalist society. In military service he was taught not only "how to kill" but also that to make the killing easier it was necessary to depersonalize the enemy, as for example by referring to the Vietnamese as "gooks"; society, by referring to blacks as "niggers," also dehumanizes them so that if society wishes to destroy a black person it is just as easy as shooting a cup. Significantly, during this extensive exposition of the defendant's view of society, his counsel at no time interposed an objection or moved to strike the testimony as irrelevant.

The defendant's testimony when taken piecemeal may look like the random ruminations of one unluckily caught up by the criminal justice system. What the prosecutor did was to fit the pieces of the jigsaw together and then demonstrate the picture to the jury. If that picture portrayed the defendant in a bad light it is the defendant who, by his testimony, invited the demonstration. *State* v. *Kinsey,* supra, 349.

With respect to those claims which are not of constitutional dimension the court covered these matters in its charge to the jury. Since the charge has not been challenged we assume that the defendant was satisfied that it covered those aspects of the

prosecutor's argument which were curable by appropriate instructions. See *State* v. *Parham,* 174 Conn. 500, 510–11, 391 A.2d 148 (1978).

## X

### SUFFICIENCY OF THE EVIDENCE

Despite Haskins' claim to the contrary, there was sufficient evidence to establish Haskins' guilt of the assaults on Officers Bradley and Cramer beyond a reasonable doubt. Since under our law both principals and accessories are treated as principals; *State* v. *Parham,* 174 Conn. 500, 508, 391 A.2d 148 (1978); if the evidence, taken in the light most favorable to sustaining the verdict, establishes that Haskins either committed the assaults charged or did some act which forms part of the offenses charged or assisted in the actual commission of the offenses or any act which forms a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the convictions must stand. Id.; *State* v. *Scott,* 80 Conn. 317, 322–23, 68 A. 258 (1907). To prove guilt as a principal, the state must prove each element of the offense charged beyond a reasonable doubt. To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must also knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. *State* v. *Laffin,* 155 Conn. 531, 536, 235 A.2d 650 (1967).

With respect to the assaults on Officers Bradley and Cramer the issue before us is whether the jury reasonably could have concluded on the facts established and the inferences reasonably drawn there-

from that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State v. Chetcuti*, 173 Conn. 165, 172, 377 A.2d 263 (1977).

## A

### ASSAULT ON BRADLEY

Bradley was riding in his police cruiser when he received word that an alarm was sounding at the New Haven Savings Bank. He immediately proceeded to the bank and stopped in front of it. As he got out of his car and proceeded toward the bank he noticed both of the bank doors folded inward. He also noticed a double-barreled shotgun pointed directly at his head. As he threw his right hand up to his face he heard a blast and felt an impact on his right arm and right side. He also noticed two black faces in the area of the weapon but he could not identify them. He then heard a male voice yell "shoot him" or "get him." As he turned to run for cover he felt another impact on the left side. Thereafter until he collapsed from his wounds he heard the sounds of many weapons firing. Later evidence established that Bradley had received a bullet wound on his left side. There was additional evidence that three black men were seen exiting the New Haven Savings Bank, all firing weapons, and that one of the fleeing men turned and fired a pistol at Bradley as he lay on the ground. From this evidence the jury could reasonably have concluded that the three men who exited the bank, two of whom, Haskins and Alston, were later apprehended at 703 George Street, were acting in concert and that at least two of them had fired the shots which seriously wounded Bradley. There was also expert testimony that it is difficult to fire both barrels of a shotgun at once because of the kickback problem.

Taking this testimony into account, together with all of the other evidence, the jury could have concluded that all three men participated in the shooting of Bradley.

## B

### ASSAULT ON CRAMER

After the confrontation at the bank Haskins and Alston commandeered a taxicab and proceeded to 703 George Street where they were cornered by the police. Officer Cramer was one of the police officers involved in the siege at George Street. When the two holdup men were called upon to surrender the response was gunfire. A male voice shouted "come and get us, send your best." One voice also said that they had a hostage. During the siege a shot rang out from above hitting Cramer in the thigh. Haskins and Alston subsequently surrendered after which the police recovered several weapons, a large quantity of ammunition, a .357 magnum revolver and a .38 caliber revolver. Several spent shell casings from these weapons were also found. The money from the bank was also recovered on a back-yard fence at 703 George Street. Subsequently a .38 class slug was removed from Cramer's thigh. Although much more evidence could be recounted, the above recitation is sufficient to establish that Haskins was a particeps criminis with his comrade in arms Alston.

## ALSTON'S APPEAL

## I

### EXCLUSION OF IDENTIFICATION EVIDENCE

The defendant Alston claims that the trial court deprived him of his rights to present a defense and to confront witnesses against him by denying him

the opportunity to question the state's witness Eugene Stonski as to the identity of the man in the bank who uttered words to the effect of "[h]it him as we go out." The trial court had previously ordered the suppression of the identification evidence pursuant to motions filed by all defendants. The defendant Alston argues that this ruling prohibits the state from introducing the suppressed evidence but not the defendant from using it to exculpate himself. He expected to show through the requested testimony that it was the defendant Haskins who spoke these words, or at the very least, that it was not the defendant Alston who uttered them. The importance he attaches to the spoken words is that it was "evidence of an intent to commit an assault and by itself was arguably solicitation to commit an offense sufficient to make the speaker an aider and abettor [to the assault on Officer Bradley] within the meaning of § 53-8."

Witnesses Cimmino, Cascio, Bradley and Stonski all testified that one of the robbers uttered words similar to "[h]it him as we go out." Only Stonski made an identification of the speaker.

If Alston assisted in the offense, shared the criminal intent and community of unlawful purpose, he is treated as a principal. General Statutes § 53a-8; *State* v. *Parham,* supra; *State* v. *Laffin,* supra. The uttered words relate to the element of intent. The evidence established that all three defendants were present in the bank, armed, and fired weapons as they exited the bank. The evidence also established that Officer Bradley received two gunshot wounds and one bullet wound. It makes no difference who the speaker was since all of the defendants participated in the robbery and shoot-

out.   The testimony Alston requested is merely cumulative on the issue of intent.   Even if he were allowed to introduce the Stonski identification, the fact that it may have been Haskins who explicitly urged the others to act does not change the fact that Alston also was an active participant in the robbery and shootout.

## II

### JOINDER

The defendant Alston claims that joinder of the three defendants denied him due process of law. He has adopted the argument of the defendant Haskins on this issue and added an argument that the identification made by Stonski by itself mandated a severance.   What we have said above in Haskins' appeal, part IV, applies here as well.   We proceed to address Alston's further claim concerning the Stonski testimony.   Since we have held, supra, Alston's appeal, part I, that the identification testimony was merely cumulative and therefore not prejudicial in nature, we cannot agree with the defendant that severance was required.

## III

### JURY ARRAY

The defendant Alston virtually adopts the argument presented by Haskins on this issue.   What we say on this issue regarding Haskins' appeal applies also to Alston's appeal.   In his brief's heading on this issue, the defendant Alston also claims an equal protection violation with regard to the jury array. The equal protection claim, however, has not been briefed and therefore is considered abandoned.

## State's Appeal—Both Cases

After their arrest on May 3, 1974, the defendants were each charged in a multiple count information with a number of offenses. The first count charged them with robbery while armed with a deadly weapon in violation of General Statutes § 53a-134 (a) (2). Subsequently the defendants were indicted in the United States District Court for the District of Connecticut for bank robbery in violation of 18 U.S.C. 2113.[6] After a trial to the jury the defendants were convicted of the federal charges and sentenced to twenty-five years impris-

[6] "[18 U.S.C.] § 2113.  BANK ROBBERY AND INCIDENTAL CRIMES (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—

Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; or

Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value not exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing

onment. The defendants filed motions to dismiss the robbery count on the ground of double jeopardy and on the ground of denial of equal protection of the laws. The trial court, *O'Sullivan, J.*, after hearing evidence ruled that "[b]ecause of the historical background of prosecutions in this court, and because of the fact that it does not seem fair to the court to try the defendants twice for the same act, regardless of which constitutional label is used, each motion to dismiss the first count of the substituted information is granted." While we may agree with some of the trial court's premises, we do not agree with its conclusions.

---

the same to have been taken from a bank, credit union, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

(e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

(f) As used in this section the term 'bank' means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, and any bank the deposits of which are insured by the Federal Deposit Insurance Corporation.

(g) As used in this section the term 'savings and loan association' means any Federal savings and loan association and any 'insured institution' as defined in section 401 of the National Housing Act, as amended, and any 'Federal credit union' as defined in section 2 of the Federal Credit Union Act.

(h) As used in this section the term 'credit union' means any Federal credit union and any State-chartered credit union the accounts of which are insured by the Administrator of the National Credit Union Administration.

The constitutional protection of accused persons against double jeopardy is intended to protect against a second prosecution for the same offense after acquittal, against a second prosecution after conviction, and against multiple punishments for the same offense. *Brown* v. *Ohio,* 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977). But these protections apply only against a single sovereign authority. There is no constitutional prohibition against a state prosecution for the same acts which resulted in a federal prosecution; *Bartkus* v. *Illinois,* 359 U.S. 121, 79 S. Ct. 676, 3 L. Ed. 2d 684, reh. denied, 360 U.S. 907, 79 S. Ct. 1283, 3 L. Ed. 2d 1258 (1959); or vice versa. *Abbate* v. *United States,* 359 U.S. 187, 79 S. Ct. 666, 3 L. Ed. 2d 729 (1959).

In *State* v. *Moeller,* 178 Conn. 67, 420 A.2d 1153, cert. denied, 444 U.S. 950, 100 S. Ct. 423, 62 L. Ed. 2d 320 (1979), we held that neither federal nor state law barred sequential prosecution in our state courts for an offense for which the defendant had been acquitted or convicted in a federal court. That holding is of such recent vintage, and nothing having occurred in the interim to warrant reconsideration of this holding, we are not inclined to disturb it. We recognize that the problem does not arise in the federal courts because there the Attorney General of the United States, out of consideration of fairness to defendants and out of regard for efficient and orderly law enforcement, has foreclosed federal prosecutions once a person has been tried and acquitted or convicted in a state court for an offense that is also an offense against the United States. *Petite* v. *United States,* 361 U.S. 529, 80 S. Ct. 450, 4 L. Ed. 2d 490 (1960). Were a similar policy to be adopted by the several state's attorneys as a matter of reciprocity as well as a matter of

fairness, judicial assistance for the implementation of this policy would seem to be indicated. *Rinaldi* v. *United States,* 434 U.S. 22, 29, 98 S. Ct. 81, 54 L. Ed. 2d 207 (1977).

It must be recognized, however, that what may be highly desirable is not necessarily required. "The *Petite* policy was designed to limit the exercise of the power to bring successive prosecutions for the same offense to situations comporting with the rationale for the existence of that power. Although *not constitutionally mandated,* this . . . policy serves to protect interests which, but for the 'dual sovereignty' principle inherent in our federal system, would be embraced by the Double Jeopardy Clause." (Emphasis added.) *Rinaldi* v. *United States,* supra, 28–29.

It is well to remember that the state's attorney, although appointed by the judges of the Superior Court; *State* v. *Moynahan,* 164 Conn. 560, 568, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973); derives his authority from the common law. *State* v. *Keena,* 64 Conn. 212, 215, 29 A. 470 (1894). "As a representative of the people of the state, he is under a duty not solely to obtain convictions but, more importantly, (1) to determine that there is reasonable ground to proceed with a criminal charge; *State* v. *Hayes,* 127 Conn. 543, 581, 18 A.2d 895 [1941]; (2) to see that impartial justice is done the guilty as well as the innocent; and (3) to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court, whether it be consistent with the contention of the prosecution that the accused is guilty." *State* v. *Moynahan,* supra. In the discharge of the functions of his high public office he

has broad discretion in determining what crime or crimes to charge in any particular situation. *State* v. *Chetcuti,* 173 Conn. 165, 168, 377 A.2d 263 (1977). So long as he acts within the jurisdiction of his office it is not appropriate for a court to set policy for the performance of his prosecutorial function. *State* v. *Carr,* 172 Conn. 608, 610–11, 376 A.2d 74 (1977).

Nor does prosecution of these defendants on the robbery charge deny them equal protection of the laws. Absent a showing of a selection deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification, none of which is shown here, conscious selectivity in enforcement of the law is not in itself a constitutional violation. *Oyler* v. *Boles,* 368 U.S. 448, 456, 82 S. Ct. 501, 7 L. Ed. 2d 446 (1962). A defendant claiming discriminatory prosecution must show (1) that others similarly situated have generally not been prosecuted and that he has been singled out and (2) that he is the victim of invidious discrimination based on impermissible considerations such as race, religion, or the exercise of a constitutionally protected right. *United States* v. *Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974). The defendants' claims fail to meet this test.

According to the trial court's finding, the present incumbent, Arnold Markle, has been state's attorney since 1968. It is the policy of his office to prosecute bank robberies which may also be subject to federal prosecution occurring within its jurisdiction where firearms are used, that is, where people are shot at by firearms. The state is proceeding with the prosecution for bank robbery in the present case because in the process of robbing the bank, the

defendants indiscriminately shot at people. There is no case in Markle's tenure where a robbery of a bank was prosecuted by the state after a federal conviction except the present case. Markle would not have prosecuted the bank robbery charge in this case were it not for the "shootout" which followed.

In 1974, there were six bank robberies in New Haven County, including the present case. Two remain unsolved, two were prosecuted in the federal court and two were prosecuted in the state court. In 1973, a white male was sentenced in the Superior Court for a bank robbery which occurred in 1972 and in which no weapons were used; there was no federal conviction. In 1973, two white males were convicted in the federal court for bank robbery. They were subsequently charged in the Superior Court, in companion cases, with attempted murder arising out of a flight from the scene of the bank robbery. They were not charged with bank robbery. There are two instances where white males who were prosecuted for bank robbery in the state court were not subsequently prosecuted in the federal court.

We may attribute the state-federal situations to an application of the *Petite* policy. Their citation is therefore of little assistance to the present discussion. We are thus left with two cases, involving in reality a single policy decision, where arguably it could be claimed that following federal prosecution for bank robbery the state, while prosecuting the bank robbers on other related charges, did not also charge them with bank robbery. The short observation to the defendants' historical recitation is that "one swallow does not a summer make."

Although the defendants claim that their prosecution for bank robbery (indeed their prosecution for the several gun battles) was because of their race, their membership in the Black Liberation Army and their radical political views, these claims are not factually supported. The trial court specifically found that the federal prosecution was brought on the basis of facts without regard to the identity of those who were the subject of the prosecution and that the federal prosecution was not brought so as to heighten the fear of the people against the Black Liberation Army. Also, the court found that the defendants were prosecuted because they broke the law and not because they called themselves "freedom fighters" and that the race of the defendants was not a factor in their federal indictment or their federal trial, nor were they prosecuted for their religious or political beliefs. Furthermore, it found that there was no conspiracy between the state and federal prosecutors and no plan to ensure that the defendants would be prosecuted by both the state and federal courts. There is no finding by the trial court that the defendants' race, affiliation with the Black Liberation Army, their religion or their political beliefs were factors in their prosecution on state charges. Whatever the labels on the outside, to make out a case of discrimination requires the presentation of more than a box of accusations.

There is no error in the defendants' appeals; there is error in the state's appeals, the judgments dismissing the robbery counts in these cases are set aside and the cases are remanded for further proceedings according to law.

In this opinion the other judges concurred.