STATE OF CONNECTICUT *v.* ANTHONY C. FALCONE
(10251)

PETERS, PARSKEY, SHEA, GRILLO and SPADA, Js.

Argued June 2—decision released August 9, 1983

*Bruce A. Sturman,* assistant public defender, and *Dennis F. Gaffney,* with whom, on the brief, was *Jerrold H. Barnett,* public defender, for the appellant (defendant).

*Lawrence J. Tytla,* deputy assistant state's attorney, with whom were *Patrick Clifford,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, for the appellee (state).

SHEA, J. A jury found the defendant guilty of assault in the first degree in violation of General Statutes § 53a-59 (a) (3).[1] On appeal he raises three issues, claiming that the court erred in (1) denying a supplemental motion for a new trial based upon the prosecution's alleged withholding of exculpatory material; (2) failing to charge the jury adequately concerning improper remarks made by the prosecutor during closing argument; and (3) failing to incorporate completely the defendant's requested charge to the jury concerning the issue of identification. We find no error.

---

[1] General Statutes § 53a-59 (a) (3) provides as follows: "(a) A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he [or she] recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person."

The jury could have reasonably found the following facts in support of their verdict: On July 6, 1978, Audrey Tamaro resided with her two children in an apartment in New Haven on the first floor of a four family duplex. Thomas Gaetano and Sandy Cicarilli lived in the apartment above Tamaro.

In the early evening at approximately 8 p.m., Tamaro heard a disturbance outside the apartment building. Upon looking out her bedroom window, she observed an automobile pass in front of the duplex. She identified the driver as Anna Fariola, whom she had seen earlier that day. As the car slowly passed the duplex, Fariola yelled, "Tom, you son of a bitch." A male voice then added "Tom, we are going to kill you." Gaetano responded, "Falcone I can't come down, you come up here. I am baby sitting."

The automobile went past the apartment building, turned around in a parking lot, and then came back toward the building. It came to a halt in front of Tamaro's apartment. Tamaro observed a man with dark hair and a beard sitting in the passenger seat. He thrust both arms out the window, pointed a pistol in her direction, and fired the weapon. The bullet struck her in the thigh, fracturing her femur, and causing other severe internal injuries.

Relying on information supplied by Gaetano, the police arrested the defendant. Fariola's car was impounded, and later a fingerprint of the defendant was found on the rear view mirror.

On July 11, 1978, while recuperating in the hospital, the victim was shown a photo array of six men, all with beards and long dark hair. Tamaro picked out the defendant's picture and identified him as the man who shot her.

## I

The first issue raised by the defendant is whether the court properly denied a post verdict motion for a new trial based upon the alleged failure of the prosecution to supply defense counsel with requested exculpatory or *"Brady"* material. *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Prior to trial, the defendant made a general *"Brady"* request, demanding "all exculpatory information and material." *United States* v. *Agurs,* supra; *State* v. *Packard,* 184 Conn. 258, 439 A.2d 983 (1981); General Statutes § 54-86c;[2] Practice Book § 741.[3] The prosecution responded to the motion, declaring that the only exculpatory material known to the prosecution was Gaetano's oral retraction of a statement given to the New Haven police department that was already known to defense counsel.

After the trial had concluded, the New Haven Register printed a story on April 6, 1980, detailing the personal trauma the victim had suffered as a result of the incident. In the article, Tamaro stated she had been

---

[2] General Statutes § 54-86c provides in part: "(a) Not later than thirty days after any defendant enters a plea of not guilty in a criminal case, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor. If prior to or during the trial of the case, the prosecutorial official discovers additional information or material which is exculpatory, he shall promptly disclose the information or material to the defendant."

[3] Practice Book § 741 provides in part that: "Upon a written motion made by a defendant within ten days after the entry of a plea, the prosecuting authority, within the time set by the judicial authority, shall disclose in writing the existence of and allow the defendant to inspect, copy, photograph and have reasonable tests made on any of the following relevant materials:
"(1) Exculpatory information or materials."

unconscious for four days after the shooting. She also described her mental condition during the recuperative period as "paranoid."[4]

On May 2, 1980, during the sentencing hearing, the prosecutor remarked that the victim was "a woman who is totally paranoid . . . ."[5] Relying on this choice of words and the newspaper report, the defendant argued that the prosecutor knew of the victim's physical and mental condition at the time of her photo identification of the defendant, as well as at trial, and that the failure to divulge this information has denied him a fair trial.

---

[4] The newspaper article, too long to be reprinted in its entirety, stated in pertinent part:

" 'I didn't realize how seriously I was injured. I woke up the next day, saw my leg up in traction and thought: "Oh this isn't too bad. I'll be back home soon." Then they told me four days had pasted [sic] and how bad my injuries were.'

"The bullet had nearly destroyed her right hip socket.

"During her stay in the hospital, she suffered not only the pain of her injuries but what she describes as 'paranoid fear' that the man who shot her would come back and finish her off."

[5] The prosecutor's remarks, made during the heat of presentencing argument, are replete with rhetorical flourish:

"The [Presentence Investigation] details the physical injuries and mental injuries, and I think they are severe. She is going to live with this nightmare everyday. The probation officer states the scar she has, which is an open scar, that is just an incredible sight to see. I did not see it, the probation officer did. She has to live with this. She is a woman who is totally paranoid, and I think for good reasons. She is just afraid; she doesn't trust anyone anymore. Once this case got going, I got calls from her everyday. She is afraid of her own shadow, and I blame the defendant for this. I think he destroyed a woman's life, and a very nice woman. This was a violent and destructive act that has changed this innocent bystander's life for good. I think he must pay severely for this, and if he does not pay severely for this, I would rather have someone else try to explain to Audrey Tamaro and to myself. I think he should be punished. I think he should receive a sentence not less than eight not more than sixteen years in State's Prison. Thank you."

In order to establish a violation of *Brady* and its progeny, the defendant must demonstrate the prosecution had possession of material[6] information favorable to the accused that was not disclosed upon request. *State* v. *Bember,* 183 Conn. 394, 404–405, 439 A.2d 387 (1981); *State* v. *Ferrara,* 176 Conn. 508, 513–15, 408 A.2d 265 (1979). The defendant has failed to present to this court any reliable evidence that the prosecution knew the victim was unconscious for four days prior to the photo identification of the defendant, or that the prosecution knew the victim was suffering from paranoid delusion.

At oral argument the defendant candidly admitted he was not aware of what information the prosecution had concerning the victim's physical or mental condition subsequent to the shooting. Instead, the defendant would have this court rely on a newspaper article as support for the proposition that the prosecution did, in fact, have such knowledge before or during trial. Apart from its general inadmissibility as a basis for a finding of fact,[7] the newspaper article does not even suggest that the prosecution was aware of the state of Tamaro's mental or physical condition.[8] The defend-

---

[6] In *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the Supreme Court held that the test of materiality was whether the information suppressed "might be sufficient to create a reasonable doubt." Id., 113; see *State* v. *Packard,* 184 Conn. 258, 439 A.2d 983 (1981); *State* v. *Bember,* 183 Conn. 394, 439 A.2d 387 (1981). Because we do not reach that issue here, we intimate no opinion on the materiality of the allegedly suppressed evidence.

[7] See *Cherniske* v. *Jajer,* 171 Conn. 372, 370 A.2d 981 (1976) (newspaper article is inadmissible hearsay because of its lack of trustworthiness, and the inability to cross-examine).

[8] There is, in fact, some doubt as to whether or not the victim was unconscious for four days prior to the photo identification. The medical records, made available to defense counsel, give no indication that the victim was unconscious. Evidence produced at trial, however, established that she had been in the intensive care unit for four days, and that she had been receiving medication. We note that this information, equally available to the defense counsel and the prosecution, provided the defendant with an opportunity to discover the information he now alleges the prosecutor supressed.

ant contends, however, that the prosecutor's remarks at the sentencing hearing corroborate his assertion that the prosecutor knew of the victim's condition. We disagree.

It appears that the prosecutor used the term "paranoid" in a hyperbolic fashion while arguing for the imposition of the sentence recommended by the state. Certainly he was not qualified to make a diagnosis of the victim's mental condition. Nor are we convinced that merely because he employed the same term as used by the newspaper, he must therefore be charged with knowledge prior to publication of all the information contained therein. At most, the prosecutor expressed a personal opinion,[9] unsupported by medical evidence, based possibly on his reading of the newspaper article or upon his discussions with the victim. The *Brady* rule simply does not encompass the prosecutor's personal opinions concerning every facet of a case, especially when those opinions may be based upon information the prosecutor received after trial from a source also available to the defendant. Accord *United States* v. *Agurs,* supra, 109; *Moore* v. *Illinois,* 408 U.S. 786, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972); *State* v. *Packard,* supra, 278.

In sum, the defendant has done no more than speculate on the contents of the prosecution's files. This court has held that "[a] finding of error cannot be based on the unsupported speculation of the defense that there were other constitutionally material matters in the state's file which were not turned over to the defense." *State* v. *Grasso,* 172 Conn. 298, 303, 374 A.2d 239

---

[9] Interestingly, defense counsel had similarly arrived at this conclusion when, at the beginning of his presentencing argument, he stated: "If the Court please, obviously [the prosecution] has some very strong *personal* feelings about this case." (Emphasis added.)

(1977), citing *State* v. *Moynahan,* 164 Conn. 560, 593, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973). Accordingly, we hold that the trial court properly denied the defendant's motion for a new trial.

## II

The defendant's next claim of error concerns a statement made by the prosecutor during the state's closing argument, and the trial judge's charge to the jury with respect to that statement.[10] Specifically, he asserts (1) that the prosecutor improperly addressed the jury during closing argument by commenting on an objection made by the defendant; and (2) that the charge to the jury failed to cure the resulting prejudice. We first set out the factual background in which the issue arose.

On the evening of July 6, 1978, Sergeant Michael Sweeney, of the New Haven police department, taped a statement given by Gaetano. On July 12, when the statement had been transcribed, Gaetano refused to sign it, stating he had been mistaken and now wished to give a new statement. Sweeney refused to record

[10] In his brief, and at oral argument, the defendant alleged that during the state's rebuttal argument the prosecutor made repeated references to excluded evidence. Because no transcript of the rebuttal argument was requested by counsel or available to this court, we consider only the claims of prosecutorial misconduct that allegedly occurred during the state's closing argument. *State* v. *Vitale,* 190 Conn. 219, 226, 460 A.2d 961 (1983); *State* v. *Sawicki,* 173 Conn. 389, 396, 377 A.2d 1103 (1977); *State* v. *Paluga,* 171 Conn. 586, 598–99, 370 A.2d 1049 (1976); *State* v. *Vega,* 163 Conn. 304, 308, 306 A.2d 855 (1972). The defendant also argued in his brief that the prosecutor had commented on excluded evidence. At oral argument, however, the defendant conceded the "gist" of his claim was not the substance of the prosecution's statements concerning the excluded evidence, but rather the inference the prosecution was trying to draw from the defendant's objection to the evidence. We, therefore, focus on that issue. We note, however, that much of the substance of the excluded evidence was before the jury. See footnote 11, infra.

Gaetano's retraction, believing Gaetano was lying. Subsequently, on July 19, Gaetano appeared at defense counsel's office where he signed a statement repudiating his prior conversations with Sweeney.[11] In the summer of 1979 Gaetano drowned.

At trial, the defendant introduced the statement of July 19 into evidence without objection. When the state attempted to introduce the statement of July 12, the defendant's objection was sustained and the document was excluded. Relying on the admitted document and other evidence, the defendant attempted to demonstrate that the police investigation was performed in a manner that would "cover-up" the allegedly mistaken arrest of the defendant.

---

[11] Significantly, the statement of July 19 refers extensively to the unsigned statement of July 12, thus revealing a great deal of the substance of that statement:

"I, Thomas M. Gaetano (dob 4-30-55) of 6 Oak Ridge Drive, New Haven, Connecticut, being duly sworn make the following statement of my own free will and accord:

"On July 6th, 1978 at approximately 8:30 p.m., I was at my home and I heard a car beeping its horn. I went to the window and looked out and saw a brown car up the street between my house and my neighbor's house on my left. I heard a voice saying: 'Come on down.' I said: 'I can't, I'm watching the baby.' The voice said: 'Come here, I got something for you.' I moved away from the window and heard noises that sounded like fireworks. I laid back down on the couch. About five (5) minutes later, the little girl (Annie) who lives downstairs came up to my apartment and said that her mother was bleeding. I ran downstairs and talked to the woman's son who said he had called an ambulance.

"Later on members of the New Haven Police Department arrived and I told them of the incident involving the person in the brown car. At that time, I told the police that I thought the person in the brown car was Anthony Falcone because my girlfriend (Sandra Cicarilli) and his girlfriend (Anna Fariola) had been arguing that afternoon and I surmised it was him.

"Another factor that influenced my surmise at that time was the fact that Anna Fariola has a brown car similar to the one I saw on the date in question.

"A few days later, I went to the New Haven Police Department and told the investigating officer that I was not sure of my identification of the vehicle

During his summation, the prosecutor tried to discredit the defendant's cover-up theory. While discussing the July 19 statement he stated: "Eventually, he [defense counsel] offers his own statement that he took on July 19th, 1978. As you recall after coming out, after argument, the State had no objection to that statement going in. The State is not just interested in convicting people, but looking for the truth. You can read it and make your own opinion as to what Thomas Gaetano was saying. On redirect, let's let it all hang out and let's have the statement that he gave to Sgt. Sweeney, the statement that he gave at the scene. No, you don't have those. All I am saying is, who might be hiding something in this case? All you have now is one statement of Thomas Gaetano, some retraction on July 19th, 1978." The defendant did not immediately object, but waited until after the court's charge to the jury which included a general caveat that no inference should be drawn where an objection to evidence was raised. At that time counsel excepted to the charge, orally requesting a more elaborate charge concerning a party's right to object to evidence. At no time did he request a mistrial. After the verdict the defendant made a motion for a new trial based upon the court's failure to give a more forceful instruction.

---

or occupant. He accused me of lying, but I explained that my initial identification was uncertain because of my nervousness and vantage point. I refused to sign a written statement which had been prepared because he refused to change it as I stated.

"At this time I want to state, without qualification, that I am not sure that the vehicle in question was Anna Fariola's car or that the occupant of the car was Anthony Falcone. As a matter of fact, I cannot even say with certainty that the occupant was a male or that the voice was that of Anthony Falcone.

"I have read the foregoing statement consisting of five (5) pages and I swear the contents thereof are the truth, the whole truth and nothing but the truth, so help me God."

When reviewing allegations of prosecutorial misconduct, it must be kept in mind that "[a] prosecutor is not an ordinary advocate. His duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury." *State* v. *Malley,* 167 Conn. 379, 389, 355 A.2d 292 (1974) (*Bogdanski, J.,* dissenting); *State* v. *Ubaldi,* 190 Conn. 559, 574, 462 A.2d 1001 (1983); *State* v. *Haskins,* 188 Conn. 432, 456–57, 450 A.2d 828 (1982); *State* v. *Ferrone,* 96 Conn. 160, 168–69, 113 A. 452 (1921). "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone,* supra, 169.

"In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions; *State* v. *Ferrone,* supra, 163; and those which are flagrant and therefore deny the accused a fair trial. *State* v. *Chapman,* 103 Conn. 453, 477, 130 A. 899 (1925)." *State* v. *Haskins,* supra, 457.[12]

There is no doubt that the prosecutor's remark was improper and inexcusable. No adverse inference may be drawn from counsel's exercise of an objection to the admission of evidence. *Commonwealth* v. *Burke,* 373 Mass. 569, 575, 369 N.E.2d 451 (1977); *People* v. *Lipman,* 59 App. Div. 2d 748, 398 N.Y.S.2d 555 (1977).

---

[12] This court has recently had reason to develop a third category: "Where a prosecutor in argument interjects remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant . . . so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." *State* v. *Ubaldi,* 190 Conn. 559, 575, 462 A.2d 1001 (1983).

Nevertheless, we note that no objection was made following the remark, suggesting defense counsel had not found the statement sufficiently prejudicial to require an immediate curative instruction from the court.[13] Accord *State* v. *Haskins,* supra, 464–65. Moreover, the prosecutor's remark, although improper, was a small part of a very long closing argument. There is no evidence in the record before this court that the prosecutor attempted to "hammer home" his point to the jury. See, e.g., *People* v. *Alicea,* 37 N.Y.2d 601, 604, 338 N.E.2d 625 (1975) (prosecutor made repeated attempts to introduce inadmissible evidence); see *Patriarca* v. *United States,* 402 F.2d 314, 322 (1st Cir. 1968), cert. denied, 393 U.S. 1022, 89 S. Ct. 633, 21 L. Ed. 2d 567, reh. denied, 393 U.S. 1124, 89 S. Ct. 987, 22 L. Ed. 2d 131 (1969). Finally, we note that the defendant proceeded, in part, on the theory that the police investigation was no more than a cover-up for a mistaken arrest. Examined in context, the prosecutor's response, invited by the defendant; *Patriarca* v. *United States,* supra, 321 n.6; *State* v. *Haskins,* supra, 464; *State* v. *Carr,* 172 Conn. 458, 470, 374 A.2d 1107 (1977); was a double-edged sword: permissible in seeking to discredit the defendant's cover-up theory; impermissible in seeking to create a prohibited adverse inference concerning the exercise of the right to object to the admission of evidence. As such, the prejudicial impact was not as great

---

[13] We recognize that requesting an immediate curative instruction may sometimes highlight a prejudicial remark in the eyes of the jury. Nevertheless, where counsel does not choose to make such a request or to seek a mistrial, he presumably does not view the remarks as so prejudicial that his client's right to a fair trial is seriously jeopardized. In *State* v. *Ubaldi,* 190 Conn. 559, 564–65, 462 A.2d 1001 (1983), where we ordered a new trial because of prejudicial remarks by the prosecutor, the defendant had objected immediately and had also moved for a mistrial. In this case there was ample opportunity to call the remark to the attention of the court in the absence of the jury either at the close of the prosecutor's closing argument in which it was made or afterwards.

as when comment is totally unprovoked.[14] *Patriarca v. United States,* supra; *State v. Haskins,* supra; *State v. Carr,* supra. Reviewing the prosecutor's remark within the context of the entire trial; *State v. Haskins,* supra, 457; *State v. Kinsey,* 173 Conn. 344, 348–49, 377 A.2d 1095 (1977); we hold it was not so prejudicial that it could not be cured by proper instruction.

The trial court charged the jury that they were to draw no adverse inference from the objections made during trial. The defendant took exception claiming that a stronger instruction was required to remove the prejudice created by the prosecutor's remark. We note, however, that the defendant was no more specific than to request "much stronger language to advise the jury that, obviously, objections and evidence which has been ruled inadmissible is not to be considered by them in any way." In such a case our duty is not to determine whether the language used by the court could have been improved upon but whether the charge fairly and adequately covered the subject matter of the exception. *State v. Kurvin,* 186 Conn. 555, 561, 442 A.2d 1327 (1982); *State v. Harrison,* 178 Conn. 689, 693, 425 A.2d 111 (1979); *State v. Huot,* 170 Conn. 463, 465, 365 A.2d 1144 (1976). The court's instruction properly covered the issue,[15] admonishing the jury not to draw any

---

[14] We do not intend to suggest that provocation is in any way an excuse for the prosecutor's behavior. In this regard, we agree with the First Circuit Court of Appeals: "[W]e do not consider that a trespass by the defense gives the prosecution a hunting license exempt from ethical restraints on advocacy." (Footnote omitted.) *Patriarca v. United States,* 402 F.2d 314, 321 (1st Cir. 1968), cert. denied, 393 U.S. 1022, 89 S. Ct. 633, 21 L. Ed. 2d 567, reh. denied, 393 U.S. 1124, 89 S. Ct. 987, 22 L. Ed. 2d 131 (1969).

[15] The court instructed the jury as follows: "During the course of this case the attorneys made various objections, took exceptions to my rulings and you were excused on a number of occasions. You are not to imply any unfavorable inferences in connection with either party because of these things. It is the duty of a lawyer to examine and cross-examine witnesses and to object to certain questions and to object to the introduction of certain exhibits and it is the duty of the judge to excuse the jury while certain matters or questions of law are debated."

"unfavorable inference" from the objections and exceptions taken during trial. The instruction was proper, and cured any prejudice resulting from the prosecutor's remark.

## III

The defendant's final claim of error concerns the court's charge to the jury on the issue of identification. Pursuant to Practice Book § 852, the defendant submitted a written request to charge on this subject that he himself characterizes as "arguably partisan." The court declined to give the proposed charge, instead using the standard charge,[16] focusing the jury's attention on the factors set out in *Manson* v. *Brathwaite,* 432 U.S. 98, 115, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); see also *Neil* v. *Biggers,* 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *State* v. *Theriault,* 182 Conn. 366, 373–74, 438 A.2d 432 (1980). The court, however, omitted reference to the "degree of the victim's attention" as requested by the defendant.

---

[16] The charge on identification is set out in full:

"One of the issues in this case is the identification of the defendant as the perpetrator of the crime. The State has the burden of proving identity beyond a reasonable doubt and you must be satisfied beyond a reasonable doubt of the identification of the defendant before you may find him guilty. If you're not convinced beyond a reasonable doubt that the defendant was the person who committed the crime you must find him not guilty.

"Identification testimony is an expression of the belief of a witness that the accused was the very person seen. Audrey Tamaro has testified that Anthony Falcone was the person she saw shoot her. The value of her testimony depends on the opportunity she had to observe him at the time of the offense and to make a reliable identification later.

"You should consider her capacity to observe and whether she had adequate opportunity to observe the accused. Her opportunity to observe him at the time of the offense is effected [sic] by how long or short a time was available, how far away or how close he was, how good the lighting was and whether she had had occasion to see or know him before the offense.

"You should be satisfied that her identification subsequent to the offense was the product of her own recollection. You may take into account both

" 'It is the law of this state that a request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. . . . It is, however, also the law of this state that a refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance.' " *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980), quoting *Mazzucco* v. *Krall Coal & Oil Co.,* 172 Conn. 355, 357, 374 A.2d 1047 (1977); see also *State* v. *Maresca,* 173 Conn. 450, 460, 377 A.2d 1330 (1977); *State* v. *Bennett,* 172 Conn. 324, 330, 374 A.2d 247 (1977); *State* v. *Avila,* 166 Conn. 569, 574, 353 A.2d 776 (1974). The instruction given substantially conformed to the charge requested by the defendant.

The court instructed the jury that "the State has the burden of proving identity beyond a reasonable doubt"; that "the value of [the victim's] testimony depends on the opportunity she had to observe him at the time of the offense"; that "[y]ou should consider her capacity to observe and whether she had adequate opportunity to observe the accused"; and that "[the victim's] opportunity to observe [the accused] at the time of the offense [was] effected [sic] by how long or short a time was available, how far away or how close he was, how good the lighting was." This charge adequately guided the

---

the strength of her identification and the circumstances under which the identification was made.

"You may also consider the length of time that lapsed between the occurrence of the crime and the photographic identification, a period here of about five days and the lapse of time between the crime and her in court identification, a period of about a year and eight months. I believe that she testified that she saw the defendant, by chance, in a store about a year after this crime and you may consider that, if it is your recollection of her testimony.

"You must consider the credibility of Audrey Tamaro's identification in the same way as you would the credibility of any other witness. Consider whether she appeared to you to be truthful and whether she had the capacity and opportunity to make a reliable observation."

jury in its deliberations. Although the court did not use the term "degree of attentiveness," it employed substantially similar language, stating "you should consider [the victim's] capacity to observe and whether she had adequate opportunity to observe." There was no error in the court's charge.

There is no error.

In this opinion the other judges concurred.