STATE OF CONNECTICUT *v.* GERALD A. GASPARRO
(11520)

SPEZIALE, C. J., PETERS, HEALEY, SHEA and GRILLO, Js.

Argued May 3—decision released July 31, 1984

*Lawrence A. Porcari,* with whom was *Robert Rasamny,* for the appellant (defendant).

*Jonathan C. Benedict,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

SHEA, J. A jury found the defendant guilty of "larceny in the first degree by obtaining property by false pretense" in violation of General Statutes § 53a-119 (2).[1] From the judgment upon the verdict he has appealed, claiming that the court erred: (1) in denying his motion to dismiss for lack of a speedy trial; (2) in denying his motion to suppress certain evidence derived from his arrest, which he claims was illegal; (3) in admitting evidence of a similar crime in which the defendant may have been involved which occurred one week after the offense charged; (4) in failing to grant his motion for mistrial because of allegedly improper argument by the state's attorney; and (5) in refusing certain jury instructions requested by the defendant. We find no error.

---

[1] "[General Statutes] Sec. 53a-119. LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to: . . . . (2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person."

I

The defendant was arrested on October 21, 1978, by the Norwalk police pursuant to an arrest warrant. He was released on bond on October 25. He was arraigned on November 27 and his motion for discovery was filed on December 14, portions of which the court granted on January 3, 1979. The court at that time also ordered a postponement of a hearing on the defendant's motion to suppress certain evidence until after the state had complied with the order of disclosure. The state filed a disclosure on August 8 and a supplemental disclosure on August 24. Another supplemental disclosure was filed on April 16, 1980.

The parties next appeared in court on May 8, 1980, the date upon which the case had been scheduled for trial.[2] At this time the state moved, over the defendant's objection, to amend the information to correct the reference to the subject of the larceny as "current monies of the United States of America" by substituting "a diamond" for the erroneous phrase. The court allowed the amendment but gave the defendant until May 28, a date agreeable to the defendant, to prepare his case. After the continuance was granted, defense counsel requested that what had transpired "be without prejudice to Mr. Gasparro's right to make a fur-

[2] From the copies of the weekly assignment lists contained in the court file, as requested by the defendant, it appears that this case was first assigned for trial on December 7, 1979, a week before the date upon which motions for disclosure and to suppress evidence were filed by the defendant. The case continued to be included in the weekly lists of cases assigned for trial while the state was complying with the order of disclosure. After the filing of a substitute information on May 8, 1980, and a continuance to May 22, as agreed upon by the defendant, the assignment lists show the case advancing from third to first position on the list, where it remained from June 24 to September 30. Thereafter, it lost ground to other cases, being listed during most of 1981 among the cases assigned for the second or third day of the trial week with approximately twenty cases assigned for trial each day.

ther motion, as far as speedy trial." The state was not ready for trial on May 28 and the case was again postponed.

The parties did not again appear in court until January 6, 1982, when the defendant's motion to suppress certain evidence was heard. During this hearing, which occupied five trial days, the defendant made an oral motion for a speedy trial. Although the record is unclear[3] as to the disposition of this motion, counsel for the defendant has conceded that much of the delay subsequent to the hearing on the motion to suppress was attributable to his request for time to examine the transcript of the hearing in order to file a brief and to his engagement in other trials. The memorandum of decision denying the motion to suppress was filed on February 23. On May 10, the defendant filed a written motion to dismiss for lack of a speedy trial, which the court denied the next day, when jury selection for the trial began.

The four factors which we are directed to consider in evaluating a claim of denial of the constitutional right to a speedy trial are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker* v. *Wingo,* 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *State* v. *Davis,* 192 Conn. 739, 741, 474 A.2d 776 (1984). "None of the factors standing alone demands a set disposition; rather it is the total mix which determines

---

[3] Neither the state nor the defendant has made reference in their briefs to the portion of the transcript where this oral motion was made, although the transcript of the hearing on the motion to suppress, January 6–8, 11–12, 1982, has been filed.

The briefs do refer to the trial transcript of May 11, 1982, concerning the argument upon the defendant's written motion to dismiss for lack of a speedy trial. At this proceeding the state claimed that the earlier oral motion for a speedy trial had been granted when the judge, *Herman, J.,* who heard the motion to suppress said, "[a]ll right, you're on trial." The defendant disputed this claim.

whether the defendant's right was violated." *State* v. *Johnson,* 190 Conn. 541, 544, 461 A.2d 981 (1983).

More than three and one-half years elapsed from the arrest of the defendant on October 20, 1978, to the start of trial on May 11, 1982. This extensive delay is clearly sufficient to warrant an "inquiry into the other factors that go into the balance." *Barker* v. *Wingo,* supra, 530. It is not so extreme, however, as the period of more than five years considered in *Barker* v. *Wingo,* supra, and found insufficient by itself to indicate a violation of the speedy trial right. "We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." Id., 523.

The defendant blames the state for all but six months of the three and one-half year delay from arrest to trial. He also claims that the failure of the state to go to trial on May 28, 1980, was deliberate and for the purpose of hampering the defense. There is nothing in the record to support this charge, however, and the trial court could reasonably have accepted the explanation offered by the state of a "hefty backlog in cases." Such a reason has been characterized as "neutral," to be weighed less heavily against the state than purposeful delaying tactics but, nevertheless, to be considered, "since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Id., 531; *State* v. *Davis,* supra, 742–43.

The defendant claims to have asserted his right of speedy trial at the time of the amendment to the information on May 8, 1980, when he requested that those proceedings "be without prejudice to [his] right to make a further motion [for] speedy trial." It is plain, however, that no motion for a speedy trial was actually made until the hearing on the motion to suppress in January, 1982. Notifying the court that the defendant

might in the future demand a speedy trial can hardly be deemed equivalent to a contemporaneous claim for a speedy trial. In fact, this remark, which the defendant now characterizes as a reservation of his right to seek a dismissal for lack of a speedy trial, can fairly be construed to mean that, in the event that he sought a speedy trial, he would file a "further motion." It should also be noted that, despite the fact that the case was carried on the weekly assignment lists sent to counsel for more than two years, several times as the first ready case, the defendant never once appeared in court to oppose a postponement.

"We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker* v. *Wingo*, supra, 532. Our review of the record indicates a complete failure on the part of the defendant to assert his right of speedy trial until the eve of trial.

The defendant has also failed to establish any significant prejudice from the delay, the fourth consideration. "Prejudice, of course, should be assessed in the light of the interests of the defendant which the speedy trial right was designed to protect." Id. Three such interests have been identified: (1) prevention of oppressive pretrial incarceration; (2) minimizing anxiety and concern of an accused; and (3) reducing the possibility of impairing the defense. Id. The first of these concerns is not involved here because the defendant was released on bond a few days after his arrest. The defendant has made no claim and presented no evidence of any anxiety on his part, though we must recognize that even an accused on bond is under some restraint on his liberty and may be living under a cloud. Id., 533. With respect to the effect of the delay on his defense, the defendant maintains that many of the police officers who testified at the suppression hearing appeared to be suffering from a lack of memory. He makes no claim

that any of his own witnesses suffered from this infirmity or that he was unable to present the testimony of any witness because of the delay. The defendant points to nothing in the transcripts which indicates that the testimony of the police officers would have been more favorable to him if their memories had been fresher. We are not persuaded that he suffered substantial prejudice in any respect from the delay.

We conclude from our review that the substantial delay in bringing the case to trial, for most of which the state must bear responsibility, was outweighed by the complete failure of the defendant to assert his right to a speedy trial and by the absence of any substantial prejudice from the delay. We find no error in the denial of the defendant's motion to dismiss for lack of a speedy trial.

## II

The basis on appeal for the defendant's motion to suppress is his claim that his arrest was illegal because of the absence of probable cause.

The crime of which the defendant was convicted occurred in Norwalk. On October 11, 1978, a person identifying himself as Arthur Abo telephoned Sheaff's Jewelers, a jewelry store located in Norwalk, and spoke to the owner, Kurt Rath, about his desire to purchase a diamond for investment purposes. Rath went to New York and bought such a diamond which he arranged for Abo to examine at the jewelry store on Friday, October 13, 1978, at noon. Abo came to the store at the appointed time and saw the diamond. He said that his investment accountant, Stuart Klein, would also examine the stone and that, if he decided upon its purchase, payment would be made from an estate account.

Shortly after 6 p.m. a man who gave the name, Stuart Klein, entered the jewelry store. He showed

Rath a letter of recommendation from an accounting firm. Klein examined the diamond and in payment gave Rath a certified check for $16,050. The next day Rath went to the Fidelity Trust Company in Stamford, the drawee of the check. There he learned that the estate account on which the check had been drawn was closed. Rath proceeded to file a complaint with the Norwalk police.

Less than a week later, on October 18, 1978, a man using the name Arthur Abo, entered Charlop's Jewelers, a jewelry store owned by Martin Charlop located on Main Street in Danbury. Abo indicated that he wanted to buy a large diamond both as an investment and as a present for his wife. He chose one of the diamonds presented to him for examination, indicated his intention to purchase it, and asked Charlop if a certified bank check would be acceptable.

Two days later, on October 20, 1978, also a Friday, Abo returned to the store to complete the transaction. In the meantime, however, Charlop had received a flyer from a jewelers' trade association detailing the circumstances of the fraud at the jewelry store in Norwalk, giving the names used, Arthur Abo and Stuart Klein, and providing a description of each. When he observed Abo in the store, Charlop instructed one of his employees to call the police.

Russell Benjamin, a detective with the Danbury police department, was dispatched to the store at 6:45 p.m. He met Charlop who told him that a man, whom he pointed out as having used the name Arthur Abo, had been in the store on a previous day and had arranged to purchase a diamond for a set price. Charlop said that he had afterward received the flyer concerning the Norwalk incident which also involved someone using the name Arthur Abo. He also gave Benjamin the trade association flyer which the officer read in the store.

Benjamin asked the man pointed out by Charlop and who fitted one of the two descriptions contained in the flyer to accompany him to police headquarters. The man, who identified himself as Andrew Posnack, cooperated. On the way to the police station, Posnack expressed some concern about his car which was parked on a side street around the corner and approximately 350 feet from the jewelry store. He pointed out an automobile bearing a New York registration. Benjamin contacted headquarters and requested that an officer be sent to watch the car.

Another detective, Roger Bertalovitz, had arrived at Charlop's Jewelers as Benjamin and Posnack were leaving the store. Bertalovitz conferred briefly with Benjamin and learned about the suspected attempt to defraud the jewelry store. He returned to headquarters where he learned that Posnack was being interviewed by Benjamin, whom he overheard speaking to someone about the Norwalk situation. He also read the flyer concerning the Norwalk incident and familiarized himself with the descriptions it contained.

After remaining at headquarters about ten or fifteen minutes, Bertalovitz received a call from the officer who had been assigned to watch Posnack's car, Philip Colla. Bertalovitz had driven Colla to the location of the car and had told him to secure it. About ten minutes after he arrived, Colla observed the defendant walk down the street, pass the car, turn around and return toward the car where Colla was stationed. He asked the officer for the time. He then withdrew a key from his pocket and attempted to enter the automobile. At this point Colla, having been instructed that nobody was to tamper with the car, told the defendant to stop and also asked whose car it was. The defendant said it belonged to a friend of his who was shopping on Main Street. The defendant then started walking on the side street toward Main Street and turned the corner toward

the jewelry store. Colla called headquarters to report that someone had been at the car. Detective Bertalovitz soon came to the scene and was advised of what Colla had observed. Both officers in the police car followed in the direction in which the defendant had walked. They found him on Main Street a short distance beyond the jewelry store. They requested some identification from the defendant, who responded that he had some in the parked car. He returned in the police car to the parked vehicle and entered it with a key. From a briefcase in the car he produced a New York driver's license bearing his name, Gerald Gasparro.

The defendant was taken to police headquarters. The parked car was also taken there and searched. The defendant moved to suppress the evidence obtained in this search as well as the identification of the defendant by witnesses as a participant in the Norwalk crime which resulted from his arrest by the Danbury police. The court, *Herman, J.,* denied the motion.

"It is well established that probable cause to arrest exists if: '(1) there is probable cause to believe a crime has been committed; and (2) there is probable cause to believe that the person to be arrested committed that crime.' " *State* v. *Daley,* 189 Conn. 717, 720, 458 A.2d 1147 (1983); *State* v. *DeChamplain,* 179 Conn. 522, 529, 427 A.2d 1338 (1980); 1 LaFave, Search and Seizure (1978) § 3.7; Practice Book § 593. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois* v. *Gates,* 462 U.S. 213, 232, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983). "[W]e deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar* v. *United States,* 338 U.S. 160, 175, 69

S. Ct. 1302, 93 L. Ed. 1879 (1949). The determination of probable cause must be made from the "totality of the circumstances." *Illinois* v. *Gates,* supra, 233.

We are satisfied from our review that when officer Bertalovitz accosted the defendant on Main Street he had sufficient reliable information to support a reasonable belief that the defendant had participated in the Norwalk fraud as well as the attempted fraud in Danbury. The trade association flyer which he had read contained an account of the circumstances of the use of the bogus certified check in bilking Sheaff's jewelry store in Norwalk of an expensive diamond. There can be no question but that it provided a sufficient basis for believing that Posnack, then using the name Stuart Klein, had committed that crime in association with another person, who used the name Arthur Abo. The flyer contained physical descriptions of both men. Bertalovitz testified that, when he first saw the defendant on Main Street, he "fit that description," presumably the one not suiting Posnack, whom the officer had previously observed. The remaining description in the flyer, given for Arthur Abo, was of "a clean-shaven, white male, about 35 years old, 5'8" tall, stocky build about 184 lbs."

Bertalovitz also was aware that Posnack, using the name Arthur Abo but matching the description in the flyer for Stuart Klein, had just been arrested by a fellow officer for an attempted fraud of a jewelry store similar in many respects to the Norwalk crime five days earlier. It was not illogical to infer from the similarity of the crimes that the technique to be employed involved participation by the person referred to in the flyer as Arthur Abo, but in a different role. In ordering Colla to watch the car identified by Posnack, Bertalovitz had a substantial basis for believing that anyone attempting to use the vehicle had probably been associated with Posnack in the Danbury criminal endeavor. The account

given by officer Colla of the defendant's approach to the parked car, his use of a key to enter it and his departure in the direction of the jewelry store without further inquiry or protest when informed that the police had effectively impounded "his friend's" vehicle strongly corroborated this belief. When Bertalovitz saw the defendant on Main Street and realized that he matched the description for Arthur Abo contained in the flyer, he then had sufficient information to justify a reasonable belief that the defendant was the same person who had participated with Posnack in the Norwalk fraud. Although the defendant stresses that the description was "general" and would have suited many other persons, the fact that the defendant had sought to unlock with his key the car used by "his friend," a known participant in the Norwalk incident who was then engaged in a similar endeavor in Danbury, narrowed significantly the number to whom the description could apply. We are persuaded that there was probable cause to arrest the defendant at the time Bertalovitz observed him on Main Street.

Whether or not the defendant could be said to have standing to object to the search of the car, which apparently belonged to Posnack, by virtue of his possession of a key and his involvement in a joint enterprise, it is clear that the subsequent search of the passenger compartment of the car after it was towed to police headquarters, may be justified as an inventory search, "a well-defined exception to the warrant requirement." *Illinois* v. *Lafayette,* 462 U.S. 640, 643, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983); *Michigan* v. *Thomas,* 458 U.S. 259, 260, 102 S. Ct. 3079, 73 L. Ed. 2d 750 (1982). In the performance of their "community caretaking functions," the police are frequently obliged to take automobiles into their custody. *South Dakota* v. *Opperman,* 428 U.S. 364, 368, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976); *Cady* v. *Dombrowski,* 413 U.S. 433,

441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). "A standardized procedure for making a list or inventory as soon as reasonable after reaching the stationhouse not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person." *Illinois* v. *Lafayette,* supra, 646.

The car, which was parked on a public street in the business area of Danbury, could hardly be left there indefinitely. Its apparent owner, Posnack, had indicated his concern about leaving the car on the street. The police officer who performed the search testified that it was routine departmental policy under such circumstances to bring a vehicle left on a city street to a parking lot of the police department and to make a complete inventory of the contents. He said that this practice was followed not only to protect the vehicle and its contents but also to forestall claims against the police for missing items.

Since the inventory search of the car was authorized, the search of the unlocked briefcase found in the passenger compartment, which contained two certified checks like those used in the Norwalk fraud, was also permissible. The police were authorized not only to take the briefcase into their custody as part of the routine inventory procedure, but also to make an examination of its contents. *Illinois* v. *Lafayette,* supra, 648. We conclude that the evidence obtained in the warrantless search of the car was admissible.

### III

The claim of the defendant that the court erred in admitting evidence of the incident at the jewelry store in Danbury at the trial of the Norwalk offense is based on two grounds: (1) that such evidence violated the general prohibition against the use of misconduct of a

defendant not related to the crime charged; and (2) that there was an insufficient showing of his involvement in the Danbury incident.

"Evidence of other misconduct, although not ordinarily admissible to prove the bad character or criminal tendencies of the accused, may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity." *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982). It is clear that the principal issue in this case was the identity of the person who had participated with Posnack in defrauding the Norwalk jewelry store. "Evidence of other crimes or misconduct . . . is admissible on the issue of identity where the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other." Id., 354. Such an inference is certainly justified in respect to the defendant's associate, Posnack, who not only selected the same kind of victim and subject matter for the attempted fraud in Danbury but even gave the name, Arthur Abo, which had been used by the defendant in Norwalk. In addition, at police headquarters a wallet was found where Posnack had been sitting, containing a Connecticut driver's license in the name of Arthur Abo and also a certified check made out to Charlop's Jewelers drawn on the same closed account as the check used in the Norwalk fraud. The use of the identical name as well as similar checks in both incidents sufficiently ties them together to indicate that the same persons participated in both.

Although the evidence of the defendant's involvement with Posnack in the aborted Danbury fraud may not have been sufficient to satisfy the standard of proof beyond a reasonable doubt necessary to sustain a conviction for that crime, the circumstances support a reasonable inference that he was probably abetting Posnack at the time. His strange behavior in approach-

ing the car, his failure to inquire why the car of "his friend" was being impounded, his possession of a key, and his departure toward Charlop's jewelry store indicate his awareness of the endeavor in which Posnack was engaged. Another circumstance indicating the close relationship between Posnack and the defendant is that in Norwalk the role of Stuart Klein had been played by Posnack while the defendant had pretended to be Arthur Abo. It is reasonable to infer that Posnack, who had the Arthur Abo driver's license in his wallet at the time of his arrest and used that name in the Danbury store, had received that document from the defendant, who probably had it in his possession as a means of identification when he acted the part of Arthur Abo in Norwalk. We conclude that there was sufficient evidence of the defendant's involvement with Posnack in Danbury to render the evidence of that affair admissible to establish his identity as a participant in the Norwalk offense.

### IV

We are unable to review fully the defendant's claim that improper argument by the prosecuting attorney prejudiced him and necessitated the granting of his motion for a mistrial because the argument in question was not recorded. Neither the state nor the defendant requested that the closing arguments be recorded. We have treated the failure to make such a request as a consent to the omission of the arguments from the record. *State* v. *Killenger,* 193 Conn. 48, 59, 475 A.2d 276 (1984); *State* v. *Vitale,* 190 Conn. 219, 226, 460 A.2d 961 (1983).

The defendant maintains, nevertheless, that the state's attorney told the jury, without support in the evidence, that the defendant had thrown some identification document bearing the name of Stuart Klein into a garbage can after his encounter with officer Colla at

the parked car. The state contends that no such state-
ment of fact was made, but that it argued merely that
an inference could be drawn from the absence of any
identification on the person of the defendant, when the
officers found him on Main Street, that he had dis-
carded any such incriminating evidence. The defend-
ant's counsel conceded that he was not sure he had
heard the remark correctly. His recital of the remark
was termed inexact by the trial court. The court, never-
theless, characterized the prosecutor's claim as "specu-
lation." The motion for a mistrial was denied, but the
court did instruct the jury that "there is absolutely no
evidence in this case that at that time and place the
defendant had any identification indicating that he was
Stewart [sic] Klein." The court charged further, "[t]he
comment by the prosecutor, I would have to place in
the realm of sheer speculation and I admonish you to
treat it as such."

"We have frequently refused to consider claims of
improper argument where the remarks of counsel have
not been transcribed and could not be reconstructed."
*State* v. *Vitale,* supra, 226; *State* v. *Sawicki,* 173 Conn.
389, 396, 377 A.2d 1103 (1977). To the extent that the
court's instructions constitute a reconstruction of the
objectionable argument, we agree with the trial court
that it was not so prejudicial that a mistrial was neces-
sary. The curative instruction given to the jury was
sufficient to remove any prejudice arising from the
prosecutor's remark. *State* v. *Kinsey,* 173 Conn. 344,
349, 377 A.2d 1095 (1977).

## V

The final claim of the defendant is that the court
failed to grant four of his requests to charge, three of
which relate to the liability of an accomplice, the fourth
pertaining to the use of the evidence concerning the
Danbury incident.

The defendant requested a charge that mere presence at a place where a crime is being committed, without more, does not make him an accomplice. In another request he sought, in the context of the defendant's apprehension near the jewelry store in Danbury, an instruction that his presence alone would merely create suspicion and would not by itself permit an inference that he knew a crime had been committed. A third request upon the subject of accomplice liability referred to the Norwalk fraud and invoked the principle that the defendant could not be held criminally responsible for the deeds of another person unless he contemplated or assented to the general criminal purpose and the crime was committed with his knowledge.

The court in charging the jury on the crime of larceny by false pretenses stated repeatedly that the statute required the defendant to have an intent to defraud and that the state must prove this element beyond a reasonable doubt. It charged also upon the accessory statute, General Statutes § 53a-8,[4] reading the text and explaining its various terms. With respect to the mental element necessary for liability as an accomplice, the jury was told that "[t]o find a person guilty . . . you must find that he has a criminality of intent and unlawful purpose in common with the person or persons who actually committed the crime." The court continued: "If you find that another person committed the larceny in question, then the next thing you must decide is whether the defendant shared the intent of the person who committed the crime." We are satisfied from our review that the charge adequately instructed the jury upon the necessary mental element for accomplice lia-

---

[4] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

bility, which is the central thrust of the defendant's requests. The failure to grant the request that "mere presence" at the scene of a crime, without more, is insufficient was not such a deficiency as to render the instructions inadequate as a guide to the jury in reaching their verdict. *State* v. *Falcone,* 191 Conn. 12, 26–27, 463 A.2d 558 (1983); *State* v. *Corchado,* 188 Conn. 653, 659–60, 453 A.2d 427 (1982). As applied to the Norwalk crime on trial, the requested instruction was inappropriate because the evidence established that the defendant's involvement in the role of Arthur Abo went far beyond "mere presence."

With respect to the attempted fraud in Danbury the "mere presence" instruction may have been more consistent with the evidence, but the defendant was not charged with that crime. The purpose of that evidence was to identify the defendant as the person who had participated as Arthur Abo in the Norwalk fraud by connecting him with Posnack, who assumed that role in Danbury. The references in the defendant's request to finding him "guilty" because of suspicion arising from his presence near Charlop's jewelry store might well have confused the jury by suggesting his involvement in Danbury had to be proved beyond a reasonable doubt before such evidence could be utilized.

The remaining request of the defendant was for an instruction that the jury should disregard the Danbury incident if they did not believe the defendant had "committed the Danbury offense." The quoted language again tends to imply erroneously that the criminal standard of proof is to be used in making the determination and, in conjunction with the request discussed previously, might well have confused the jury. With reference to the Danbury incident, the court charged adequately on the limited purpose for which that event should be considered and left to the jury the weight to

be given the evidence "that the defendant was possibly connected, in some degree, to an attempted larceny in Danbury."[5]

There is no error.

In this opinion the other judges concurred.

---

[5] This portion of the charge was as follows:

"There has been evidence presented to you that the defendant was possibly connected, in some degree, to an attempted larceny in Danbury. This evidence may not be considered by you to prove that the defendant is guilty of the crime charged against him, nor may it be considered by you to show that the defendant is a man of bad character.

"Such evidence is admissible for a variety of other purposes; however, such as showing such things as intent, an element in the crime, identity, malice, motive or a system of criminal activity.

"Having heard such evidence its applicability to any of these exceptions is up to you."

Although some of the purposes specified for which the Danbury evidence might have been used under this instruction, such as "malice," were irrelevant to the issues in the case, no exception to the charge was taken by the defendant in that respect.